Dustin Charles CRAWFORD, Minor Child, By and Through his mother and next friend, Cynthia CRAWFORD, individually and as surviving heir of Milton Foster, Jr.,

and

Joann Outlaw as Administrator of the Estate of Milton Foster, Jr., Plaintiffs,

v.

The CITY OF KANSAS CITY, KANSAS, John Cheek, Jeff Cheek, and Greg Lawson, Defendants.

Civil Action No. 95–2336–DES.

United States District Court, D. Kansas.

Jan. 17, 1997.

Donald M. McLean, John M. Duma, Roger W. McLean, McLean & McLean, Kansas City, KS, for Cynthia Crawford, Dustin Charles Crawford and Joann Outlaw.

David W. Carson, John H. Fields, Carson & Fields, Kansas City, KS, for Sheila D. Richardson.

Henry E. Couchman, Jr., Daniel B. Denk, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, Maurice J. Ryan, Harold T. Walker, City of Kansas City, Kansas Legal Dept., Kansas City, KS, for City of Kansas City, Kan. and Greg Lawson.

G. Gordon Atcheson, Weston R. Moore, Blake & Uhlig, P.A., Gary W. Long, Kansas City, KS, for John Cheek and Jeff Cheek.

### *MEMORANDUM AND ORDER*

SAFFELS, Senior District Judge.

This matter is before the court on the Motion of Defendant Jeff Cheek for Summary Judgment and Motion of Defendant John Cheek for Partial Summary Judgment (Doc. 86).

## I. *BACKGROUND*

The following facts are uncontroverted, or where controverted, construed in the manner most favorable to the plaintiffs as the non-moving party.

The plaintiffs premise their suit on a series of contacts between certain Kansas City,

Kansas, police officers and Milton Foster, Jr. Defendants John Cheek and Jeff Cheek, who are brothers, were employed as commissioned law enforcement officers by the Kansas City police department. Milton Foster was a certified licensed security guard. On February 21, 1994, while on-duty and riding in a marked patrol car, Jeff Cheek observed a security guard car operating its flashing yellow lights. Kansas City has ordinances restricting the use of flashing lights on vehicles. Jeff Cheek stopped the security guard car and approached the driver, Mr. Foster.

At the time of the stop, Mr. Foster was carrying a handgun in his side holster. A Kansas City ordinance permits security guards to carry firearms on their persons while engaged in the performance of their duties, but not when in transit to and from their jobs. Jeff Cheek took Mr. Foster's gun and placed it in the patrol car, informed Mr. Foster that he would need to arrest him for unlawfully carrying a firearm, and placed Mr. Foster in handcuffs.

Mr. Foster called another security guard on his two-way radio to come pick up his car. Mr. Foster later stated to police that he told the guard to watch the arrest so that he could be a good witness. Jeff Cheek then said, "That's it, you're resisting," and used his billy club to place Mr. Foster in a choke hold. George Davis testified that when he arrived on the scene, Jeff Cheek had Mr. Foster in a choke hold and that Mr. Foster was yelling at Jeff Cheek to stop choking him. Jeff Cheek issued citations to Mr. Foster for displaying unauthorized lights on his vehicle, resisting arrest, and unlawfully carrying a firearm. Mr. Foster was subsequently found not guilty of the firearm charge.

Another encounter occurred between Jeff Cheek and Mr. Foster on March 11, 1994. Jeff Cheek, again while on-duty and riding in a marked patrol vehicle, observed an unmarked car traveling with its red emergency lights on. A city ordinance prohibits lamps capable of displaying a red light directly in front of the vehicle. Jeff Cheek stopped the car, which was driven by Mr. Foster.

Jeff Cheek asked Mr. Foster for proof of automobile insurance. Mr. Foster told Jeff Cheek that his proof of insurance was in his glovebox and offered to get it. Jeff Cheek answered, "No, I'll get it," and proceeded to search Mr. Foster's glovebox, backseat, and trunk. Jeff Cheek issued citations to Mr. Foster for improperly having red lights on a non-emergency vehicle, and for failing to have proof of automobile liability insurance.

In approximately August 1994, Jeff Cheek told Luana Davis and Emma Spencer that Mr. Foster was "in a lot of trouble," and that he was "going to get him."

On or about August 26, 1994, John Cheek, while on-duty and parked at a carwash, observed Mr. Foster driving by. John Cheek pulled out of the carwash and began to pursue Mr. Foster. While the defendants maintain that Mr. Foster was speeding, the plaintiffs claim that Mr. Foster was not violating any law when the pursuit began. John Cheek failed to apprehend Mr. Foster.

Jeff Cheek encountered Mr. Foster again on September 12, 1994. Jeff Cheek observed Mr. Foster at a carwash and pulled into the same stall with him. Jeff Cheek then followed Mr. Foster onto the street, and stopped Mr. Foster as he turned back into the carwash. Mr. Foster used his cellular phone to call a number of his friends or associates to the scene, and then got out of his car and approached the police car. Jeff Cheek asked to see Mr. Foster's driver's license. Mr. Foster responded that he had locked it in his car.

Mr. Foster was recording his conversation with Jeff Cheek on a tape recorder concealed in his shirt pocket. Mr. Foster claimed that when the tape recorder stopped, making an audible sound, Jeff Cheek proceeded to search him, located the tape recorder, and removed it from his pocket. According to Mr. Foster, Jeff Cheek then began erasing the tape. Jeff Cheek then returned the tape recorder and tape to Mr. Foster. Jeff Cheek issued citations to Mr. Foster for improper stopping on a roadway and for failing to have a driver's license in his possession.

Mr. Foster's final confrontation with the Cheeks occurred on October 29, 1994. On that day, Jeff Cheek, John Cheek, and John Cheek's wife went to Ziffel's restaurant in

Bonner Springs, Kansas, where they met fellow officer Greg Lawson and his wife. After the Cheeks arrived at Ziffel's, Mr. Foster entered the restaurant. Mr. Foster was employed as an armed security guard at Ziffel's to handle situations involving disorderly patrons. Mr. Foster was wearing his security guard uniform, including a "duty belt" on which he carried a metal baton and handgun.

As Mr. Foster walked to the bar to order soda, John Cheek approached him from behind and said something to him. John and Jeff Cheek began arguing with Mr. Foster in loud voices. Mr. Foster said, "All right, that's it. Let's take it outside." Mr. Foster asked the bartender to call "911," and asked Ron Palcher to follow him out to "make sure there's no trouble."

Mr. Foster walked to the exit of the restaurant and told the Cheeks and Greg Lawson they would have to leave. The four men began cussing at each other. A fight ensued, with both of the Cheeks and Mr. Lawson throwing punches at Mr. Foster. There is testimony that Jeff Cheek struck the first blow. Mr. Foster kicked at the defendants. The Cheeks and Mr. Lawson backed Mr. Foster up against a wall, and the Cheeks continued to punch Mr. Foster. At some point, Ron Palcher, Russell Moretine, and Chris McDonald came to the aid of Mr. Foster. Mr. Foster began swinging his baton at the Cheeks and at Mr. Lawson, with John Cheek receiving the majority of the blows. Mr. Foster drew his gun, pointed it in the air, and ordered the three defendants to leave. According to John and Jeff Cheek, they told Mr. Foster that he was under arrest and to put down his weapons; witnesses at the scene, however, did not hear these orders. Mr. Foster holstered his gun and went back inside the restaurant.

After re-entering the restaurant, Mr. Foster asked for someone to call the police. The Cheeks and Mr. Lawson remained in the parking lot. John Cheek retrieved a gun from his car. The Cheeks approached the entrance to Ziffel's together, where they encountered Mr. Moretine blocking their entry. John Cheek pointed his gun at Mr. Moretine's head and demanded entrance. Mr.

Moretine moved aside. As he entered, John Cheek said, "I'm going to kill that black son-of-a-bitch." John and Jeff Cheek found Mr. Foster inside with his baton in hand. John Cheek fired four shots at Mr. Foster, thereby causing Mr. Foster's death.

Count I of the amended pretrial order states a claim for assault and battery. Count II states a claim for the death of Mr. Foster pursuant to 42 U.S.C. § 1983. Count III states a claim pursuant to § 1983 for actions occurring prior to the date of Mr. Foster's death. Count IV states a claim pursuant to 42 U.S.C. § 1985(3).

## II. SUMMARY JUDGMENT STANDARDS

A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. at 2510. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* "Only disputes over facts that might properly affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1036 (10th Cir.1993). The movant may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. at 2552–53.

## III. DISCUSSION

### A. 42 U.S.C. § 1983 Claims Arising Prior to October 29, 1994

42 U.S.C. § 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

The plaintiffs allege that on several occasions, Jeff Cheek and John Cheek arrested, attempted to arrest, and subjected Mr. Foster to unreasonable searches without probable cause.

The defendants argue that none of the contacts between either Jeff Cheek or John Cheek and Mr. Foster prior to the October 29, 1994, confrontation at Ziffel's is actionable under § 1983. According to the defendants, Jeff Cheek's vehicle stops of Mr. Foster did not violate the Fourth Amendment, in that the stops were supported by probable cause. The defendants also submit that John Cheek's attempted stop of Mr. Foster on August 26, 1994, did not constitute a search or seizure, and therefore did not violate Mr. Foster's constitutional rights. Lastly, the defendants contend that they are entitled to summary judgment on the plaintiff's Fourteenth Amendment claims.

■ In their response to the defendants' motion for summary judgment, the plaintiffs concede that John Cheek's attempted stop of Mr. Foster does not rise to the level of a Fourth Amendment violation. As for claims arising under constitutional provisions other than the Fourth Amendment, the plaintiffs submit only that Jeff Cheek arrested Mr. Foster "for the purpose of harassing" him. The defendants infer from this allegation a claim under the Equal Protection Clause of the Fourteenth Amendment. To assert an equal protection violation, however, a plaintiff must allege intentional discrimination due to an impermissible classification, such as race. *Shortino v. Wheeler,* 531 F.2d 938 (8th Cir. 1976). The plaintiffs do not respond to the

defendants' assertion that any claims arising under the Fourteenth Amendment should be dismissed as a matter of law, and the court agrees with the defendants that the plaintiffs have failed to properly state an equal protection claim. The court therefore grants summary judgment as to all § 1983 claims against John Cheek arising prior to October 29, 1994, and as to any claims against Jeff Cheek arising prior to October 29, 1994, other than alleged violations of the Fourth Amendment.

Before proceeding to the plaintiffs' Fourth Amendment claims against Jeff Cheek, the court must first address the defendants' argument that statements which Mr. Foster made to the Internal Affairs Department of the Kansas City, Kansas, police department constitute inadmissible hearsay. Detective R. Miller interviewed Mr. Foster on August 31, 1994, and again on September 27, 1994, in response to Mr. Foster's complaints of harassment against John and Jeff Cheek. The interviews were tape recorded and later transcribed.

■ The plaintiffs submit that the transcripts should be admitted as an exception to hearsay under Fed.R.Evid. 803(8)(C). Rule 803(8)(C) provides that records, reports, statements, or data compilations of public offices or agencies setting forth factual findings resulting from an investigation made pursuant to authority granted by law are admissible. Interview transcripts do not constitute "factual findings," however, in that they are not the result of any type of evaluative process. *United States v. D'Anjou,* 16 F.3d 604, 610 (4th Cir.1994), *cert. denied,* 512 U.S. 1242, 114 S.Ct. 2754, 129 L.Ed.2d 871 (1994).

■ The plaintiffs also contend that the transcripts are admissible under either Fed. R.Evid. 803(24) or 804(b)(5), the "catch-all" hearsay exceptions. Both rules provide as follows:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement

is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Whether to admit evidence under the residual hearsay exceptions is committed to the discretion of the trial court. *United States v. Tome,* 61 F.3d 1446, 1454 (10th Cir.1995).

The defendants do not argue that Mr. Foster's statements to the police fail to meet the criteria set forth in (A), (B), or (C) above. Indeed, Mr. Foster's statements are clearly offered as evidence of a material fact. In his statements, Mr. Foster recounts those facts giving rise to his claims of unreasonable searches and seizures. And because Mr. Foster is unavailable to testify, his statements are more probative on the point for which they are offered than any other evidence which the plaintiffs could produce.

■■■ The defendants do contend that the proffered evidence does not carry "equivalent circumstantial guarantees of trustworthiness." Factors which courts consider in assessing a statement's circumstantial guarantees of trustworthiness include (1) whether the declarant is available for cross-examination, (2) whether the statement was made close on the heels of the alleged event, and (3) the presence or absence of corroborating evidence. *United States v. Iaconetti,* 406 F.Supp. 554, 559 (E.D.N.Y.1976), *aff'd,* 540 F.2d 574 (2d Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977); *United States v. Pena,* 527 F.2d 1356, 1362 (5th Cir.1976), *cert. denied,* 426 U.S. 949, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976). In addition, while the fact that a declarant was under oath is insufficient, standing alone, to meet the requirement of circumstantial guarantees of trustworthiness, it does tend to indicate reliability. *United States v. Owens,* 789 F.2d 750, 756 (9th Cir.1986), *rev'd on other grounds,* 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).

The second factor noted above supports admissibility, in that Mr. Foster gave his statements soon after the events in question; the police recorded his second statement only fifteen days after the "car wash incident." As for the third factor, the court notes that there is corroboration of Mr. Foster's version of his February 21, 1994, arrest. Mr. Foster stated to Internal Affairs that Jeff Cheek falsely accused him of resisting arrest, and proceeded to use his billy club to place him in a choke hold. George Davis, a witness at the scene, testified at his deposition that Jeff Cheek placed Mr. Foster in a choke hold with his baton, and that Mr. Foster yelled at Jeff Cheek, "Stop choking me." The fact that Mr. Foster signed affirmations of his statements, in which he stated that he was aware that knowingly making a false report constituted a felony under Kan.Stat.Ann. § 21–3711, also supports the statements' reliability.

On the other hand, the first factor noted above, the declarant's unavailability for cross-examination, obviously weighs against admitting Mr. Foster's statements. Courts have consistently relaxed the hearsay rule, however, when the defendant has wrongfully caused the witness's unavailability. *Steele v. Taylor,* 684 F.2d 1193, 1201 (6th Cir.1982), *cert. denied,* 460 U.S. 1053, 103 S.Ct. 1501, 75 L.Ed.2d 932 (1983). Evidence admitted as a result of such wrongful conduct includes uncross-examined statements and prior statements to the police. *Id.* at 1201 & 1202 n. 10; *see also United States v. Balano,* 618 F.2d 624, 626 (10th Cir.1979), *cert. denied,* 449 U.S. 840, 101 S.Ct. 118, 66 L.Ed.2d 47 (1980) (where defendant had coerced witness into silence by threatening witness's life, defendant waived his right to make hearsay objections to witness's grand jury testimony); *United States v. Houlihan,* 887 F.Supp. 352, 356–57 (D.Mass.1995) (where defendant had murdered witness, defendant waived right to object to witness's out-of-court statements to the police). In light of our ruling today that there exist genuine issues of material fact regarding Jeff Cheek's role in the death of Milton Foster, the court finds that the above-cited case law weighs in favor of admitting Mr. Foster's statements to the police into evidence. The court further finds that the general purposes of the rules of evidence and the interests of justice might best be served

by the admission of Mr. Foster's statements. Fed.R.Evid. 804(b)(5).

■ Having concluded that Mr. Foster's statements to the police may be admissible, it becomes clear that the plaintiffs have presented sufficient evidence from which a reasonable jury could find that certain actions of Jeff Cheek prior to October 29, 1994, violated Mr. Foster's Fourth Amendment rights. The defendants represent that on February 21, 1994, Jeff Cheek stopped Mr. Foster for operating his yellow flashing lights in violation of Kansas City, Kansas Code § 35–709(c). According to Mr. Foster, Jeff Cheek also took Mr. Foster's gun and placed it in the patrol car, informed Mr. Foster that he would need to arrest him for unlawfully carrying a firearm, and placed Mr. Foster in handcuffs. When Mr. Foster told a fellow security officer to watch the arrest so that he could be a good witness, Jeff Cheek allegedly said "That's it, you're resisting," and used his billy club to place Mr. Foster in a choke hold.

The plaintiffs concede that the February 21, 1994, stop was supported by probable cause. The plaintiffs contend, however, that Mr. Foster was engaged in the performance of his duties as a security guard at the time of the stop, and that Jeff Cheek therefore did not have probable cause to arrest him for a firearm violation. The plaintiffs also argue that Jeff Cheek engaged in an unprovoked attack on Mr. Foster.

■ The proper inquiry in a § 1983 claim based on false arrest is not whether the person arrested actually committed an offense, but whether the arresting officer had probable cause to believe that he had. *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir.1988). The fact that Mr. Foster was later acquitted of the firearms charge does not mean that Jeff Cheek did not have probable cause to arrest him. The Fourth Amendment requires not only that a detention be justified at its inception, however, but also that it be reasonably related in scope to the circumstances which justified the stop in the first place. *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). The plaintiffs have offered evidence that after removing Mr. Foster's gun and placing him in handcuffs, Jeff Cheek's action in then placing Mr. Foster in a choke hold was not reasonable under the circumstances.

There is also evidence as to other actions by Jeff Cheek from which a reasonable jury could conclude that the defendant violated Mr. Foster's Fourth Amendment rights. On March 11, 1994, Jeff Cheek stopped Mr. Foster and issued him a citation for improperly displaying red lights on a non-emergency vehicle. According to Mr. Foster, Jeff Cheek asked to see proof of automobile insurance, and Mr. Foster offered to get his insurance card out of the glovebox. Jeff Cheek allegedly answered, "No, I'll get it," and proceeded to search Mr. Foster's glovebox, back seat, and trunk. Jeff Cheek also pulled Mr. Foster over on September 12, 1994, allegedly for improper stopping on a roadway. Mr. Foster recorded his conversation with Jeff Cheek on a tape recorder concealed in his shirt pocket. Mr. Foster claimed that when the tape recorder stopped, making an audible sound, Jeff Cheek commenced to search him, located the tape recorder, and removed it from his pocket. According to Mr. Foster, Jeff Cheek then began erasing the tape.

■ When a police officer has made a lawful custodial arrest of the occupant of an automobile, the officer may, as a contemporaneous incident of the arrest, search the passenger compartment of the arrestee's vehicle. *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). The officer may not, however, search the vehicle's trunk under such circumstances. *Id.* at 460–61 n. 4, 101 S.Ct. at 2864 n. 4. In any event, the defendants have failed to offer evidence that Jeff Cheek had placed Mr. Foster under arrest at the time he allegedly searched Mr. Foster's car on March 11, 1994.

As for the September 12, 1994, tape recorder incident, the defendants cite *United States v. Place*, 462 U.S. 696, 708–09, 103 S.Ct. 2637, 2645–46, 77 L.Ed.2d 110 (1983), in support of their contention that brief seizures of property do not offend the Fourth Amendment. *Place* also held, however, that even a brief detention of personal property requires the government to show "specific articulable facts that the property contains contraband

or evidence of crime." *Id.* at 706, 103 S.Ct. at 2644. Here, the defendants have failed to show that Jeff Cheek's seizure of Mr. Foster's tape recorder, and partial erasure of Mr. Foster's tape, were based on a belief that Mr. Foster had property containing contraband or evidence of crime.

■ The issue of probable cause in a civil rights suit is normally a jury question. *De-Loach v. Bevers,* 922 F.2d 618, 623 (10th Cir.1990), *cert. denied,* 502 U.S. 814, 112 S.Ct. 65, 116 L.Ed.2d 41 (1991). We conclude that the plaintiffs have set forth sufficient facts from which a jury could find that certain of Jeff Cheek's actions prior to October 29, 1994, violated Mr. Foster's Fourth Amendment rights, and we therefore deny summary judgment as to such claims.

**B.** *42 U.S.C. § 1983 Claims Against Jeff Cheek Arising From Defendant's Conduct on October 29, 1994*

The plaintiffs allege that John Cheek and Jeff Cheek used excessive force in attempting to arrest Mr. Foster on October 29, 1994, and thereby caused Mr. Foster's death. The defendants concede that there exist genuine questions of material fact as to John Cheek's role in the incident which preclude summary judgment. The defendants argue, however, that as a matter of law, Jeff Cheek did not use excessive force, and that he is therefore entitled to summary judgment.

■ A claim that an officer used excessive force in effecting an arrest is evaluated under the Fourth Amendment standard of reasonableness. *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989). Whether the force used was unreasonable "is an issue to be determined in light of all the circumstances of each case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and actively resist[ed] arrest or at-

tempt[ed] to evade arrest by flight." *Zuchel v. Spinharney,* 890 F.2d 273, 274 (10th Cir. 1989).

■ The defendants first argue that Jeff Cheek was not directly responsible for Mr. Foster's death, in that it was John Cheek who actually shot Mr. Foster. Evidence exists, however, that Jeff Cheek did use excessive force against Mr. Foster. There is testimony that Jeff Cheek delivered the first blow in the confrontation between Mr. Foster and the defendants.

■ More significantly, there is evidence that Jeff Cheek could have intervened to stop the shooting.[1] An officer who does not prevent a fellow officer's use of allegedly excessive force "may be liable [under § 1983] if he had the opportunity to intervene but failed to do so." *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1433 (10th Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 65, 88 L.Ed.2d 53 (1985); *see also Meade v. Grubbs,* 841 F.2d 1512, 1528 (10th Cir.1988) (personal participation in the deprivation of a federal right may be found in the defendant's acquiescence in illegal action).

Dennis L. Roberson, a witness to the incident at Ziffel's, testified that Jeff Cheek was in the parking lot with John Cheek when John Cheek retrieved a gun from his car. John and Jeff Cheek approached the restaurant together, and Mr. Roberson heard John Cheek say, "I'm going to kill that black son of a bitch." A jury could infer from Jeff Cheek's proximity that he heard John Cheek's statement. According to Jeff Cheek, he re-entered Ziffel's with his brother in order to arrest Mr. Foster, and was present when John Cheek shot Mr. Foster. A reasonable jury could find from this evidence that Jeff Cheek had the opportunity to try to prevent Mr. Foster's shooting but failed to do so. *See Berry,* 796 F.Supp. at 1405 (defendant's personal participation in arrest of plaintiff, accompanied by failure to

---

1. The defendants submit that the plaintiffs have failed to specifically allege a "failure to intervene" theory, and that the court should therefore not consider such a theory. The court disagrees. The amended pretrial order states facts supporting § 1983 liability under a failure to intervene theory, and cites the relevant statute. *See Berry*

*v. City of Phillipsburg, Kan.,* 796 F.Supp. 1400, 1404 (D.Kan.1992) (allowing claim under such circumstances). The plaintiffs have also framed as an issue of law "[w]hether the wrongful acts *or omissions* of the defendant officers, if any, proximately caused Milton Foster Jr.'s death." (emphasis added).

intervene in fellow officer's excessive use of force, was more than sufficient to establish nexus between defendant's conduct and plaintiff's deprivation of federal rights). The court therefore denies summary judgment on the plaintiffs' claims against Jeff Cheek arising out of Mr. Foster's shooting.

### C. *42 U.S.C. § 1985(3) Claims*

The plaintiffs allege in the amended pre-trial order that the defendants conspired to cause the unlawful attempted arrest of Mr. Foster at Ziffel's, and conspired to use unreasonable force in making that arrest. The plaintiffs also claim that prior to Mr. Foster's death, Jeff Cheek conspired to deprive Mr. Foster of his license as a private security guard, and that both Jeff Cheek and John Cheek conspired to unlawfully arrest and search Mr. Foster on several occasions. Finally, the plaintiffs contend that John Cheek and Jeff Cheek conspired to "contrive stories" about their role in the incident at Ziffel's in order to avoid punishment.

■ To succeed on a claim under 42 U.S.C. § 1985(3), a plaintiff must show "(1) the existence of a conspiracy (2) intended to deny [him] equal protection under the laws or equal privileges and immunities of the laws (3) resulting in an injury or deprivation of federally-protected rights, and (4) an overt act in furtherance of the object of the conspiracy." *Murray v. City of Sapulpa,* 45 F.3d 1417, 1423 (10th Cir.1995). The conspiracy must also be motivated by a racial or otherwise class-based discriminatory animus. *Dixon v. City of Lawton, Okla.,* 898 F.2d 1443, 1447 (10th Cir.1990).

■ The plaintiffs fail in their response to the defendants' motion for summary judgment to refer the court to any facts which would support the existence of a conspiracy either before or after the day of the shooting. Rather, the plaintiffs maintain that "[a]ll the elements of a Section 1985 claim were fully satisfied in less than a minute," i.e., when John Cheek announced "I'm going to kill that black son-of-a-bitch," the Cheeks entered Ziffel's together, and John Cheek shot Mr. Foster. The plaintiffs urge that a jury could infer from these facts agreement, action, and racial animus.

The defendants argue that John Cheek's use of the word "black" was descriptive, rather than pejorative, and thus betrays no racial animosity. Analogous to this case is *Sampson v. Village Discount Outlet, Inc.,* 832 F.Supp. 1163, 1166 (N.D.Ill.1993), *aff'd,* 43 F.3d 1474, 1994 WL 709278 (7th Cir.1994), in which the defendant shackled the plaintiff to a wall and said "I will show to you f——— Jew, who I am!" The court held that the statement did not evince racial animus, in that the word "Jew" was not an opprobrium that stigmatized Jewish people because of their ethnicity, or a term that was circumspectly used in the presence of Jews. *Id.* at 1167, 1169. The *Sampson* court further held that even if racial animus could be inferred from the statement, the commission of an offense accompanied by a single racist remark could not sufficiently demonstrate that racial animus was a motivating factor behind the offense. *Id. See also Dreyer v. Jalet,* 349 F.Supp. 452, 472 (S.D.Tex.1972), *aff'd,* 479 F.2d 1044 (5th Cir.1973) (emphasis added) (requiring evidence that individuals engaged in a common purpose *over a period of time* in order to find conspiracy). Similarly, the court finds that John Cheek's statement, alone, is not sufficient evidence of race-based animus such that a jury could find the existence of a conspiracy under § 1985(3), and grants summary judgment to the defendants on this claim.

### D. *State Law Assault and Battery Claim*

■ The defendants first argue that the plaintiffs' state law claim should be dismissed as to both Jeff and John Cheek on the grounds that Mr. Foster consented to mutual combat. The defendants acknowledge that Kansas law permits mutual combatants to bring assault and battery actions. *See, e.g., Joy v. Brown,* 173 Kan. 833, 252 P.2d 889, 892 (1953); *McNeil v. Mullin,* 70 Kan. 634, 79 P. 168, 170 (1905). Nevertheless, the defendants urge the court to find that if the question were presented today, the Kansas Supreme Court would hold that consent bars all civil claims arising out of a mutual combat situation. The defendants base their position on dicta in which the supreme court noted

that the rule followed in Kansas has been criticized. *See, e.g., Joy,* 252 P.2d at 892; *Wood v. McKeever,* 141 Kan. 323, 41 P.2d 989, 991 (1935). The defendants further assert that because the supreme court has followed the *Restatement (Second) of Torts* on other tort issues, the supreme court would also adopt the *Restatement* position that consent generally bars recovery in tort actions. *Restatement (Second) of Torts* § 892C (1977).

This court will not speculate as to what the Kansas Supreme Court might do if presented with the defense of consent today, and will not overrule Kansas law as to a matter on which the supreme court has clearly spoken. *See Pierce v. Cook & Co., Inc.,* 518 F.2d 720, 724 (10th Cir.1975), *cert. denied,* 423 U.S. 1079, 96 S.Ct. 866, 47 L.Ed.2d 89 (1976) (federal court must accept most recent pronouncement of state law). Nor can the court accept the defendants' invitation to certify to the Kansas Supreme Court the question of whether consent bars a civil claim. Kan.Stat. Ann. § 60–3201 provides as follows:

> The Kansas supreme court may answer questions of law certified to it by ... a district court ... when requested by the certifying court *if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent* in the decisions of the supreme court and the court of appeals of this state.

(Emphasis added). This court is bound to follow Kansas law as to the defense of consent as articulated in *McNeil v. Mullin,* and as most recently stated in *Joy v. Brown.*

■ The defendants next contend that, contrary to the plaintiffs' assertions, Jeff Cheek is not liable as an aider and abettor to battery. The elements of aiding and abetting a tortious act are:

> (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3)

the defendant must knowingly and substantially assist the principal violation. *State ex rel. Mays v. Ridenhour,* 248 Kan. 919, 811 P.2d 1220, 1232 (1991) (quoting *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C.Cir. 1983)).

■ The defendants concede that the court should submit the question of John Cheek's liability for the wrongful death of Mr. Foster to a jury. The plaintiffs have therefore made a sufficient showing as to the first element of aider and abettor liability, i.e., that the primary tortfeasor performed a wrongful act which caused an injury. As for the second element, the plaintiffs have offered evidence that John Cheek said, in his brother's presence, "I'm going to kill that black son-of-a-bitch." A jury could infer from this evidence that Jeff Cheek heard the remark, and was therefore aware of his role in the overall activity when he reentered Ziffel's with his brother.

■ The third element of aider and abettor liability requires that the defendant knowingly and substantially assisted the principal violation. In determining whether the defendant has "substantially" assisted the principal, the court examines "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the [principal] and his state of mind." *Id.* 811 P.2d at 1232; *see also Bailey v. Kenney,* 791 F.Supp. 1511, 1527–28 (D.Kan.1992) (applying *Mays* to find aider and abettor liability for assault). The court may also consider a sixth factor, duration of the assistance provided. *Mays,* 811 P.2d at 1232. "[T]he length of time an alleged aider and abettor has been involved with the tortfeasor affects the quality and extent of their relationship and probably influences the amount of aid provided." *Id.* This sixth factor also provides evidence of the defendant's state of mind. *Id.*

Applying these factors to the case at hand, the court finds that a reasonable jury could conclude that Jeff Cheek's assistance in the alleged assault and battery of Mr. Foster was substantial. First, there is evidence that approximately two months prior to Mr. Foster's death, Jeff Cheek told Luana Davis and

Emma Spencer that Mr. Foster was "in a lot of trouble," and that he was "going to get him." These statements, viewed in light of Jeff Cheek's prior encounters with Mr. Foster, represent evidence of Jeff Cheek's state of mind on October 29, 1994. There is evidence that Jeff Cheek was the instigator of the violence which led to Mr. Foster's shooting. There is also evidence that Jeff Cheek saw his brother retrieve a gun from his car, and heard him announce his intention to kill Mr. Foster. Finally, Jeff Cheek re-entered Ziffel's with his brother, and stood with him as he shot Mr. Foster four times.

### E. *Authority of Police Officers to Act Outside Their Jurisdiction*

Finally, the defendants ask the court to determine whether John and Jeff Cheek had the legal authority to act as law enforcement officers while at Ziffel's on October 29, 1994. The court notes that defendants City of Kansas City, Kansas, and Greg Lawson have also raised this question of law in their motion for summary judgment. The court shall defer ruling on this issue until such time as it rules on the City of Kansas City, Kansas' and Greg Lawson's motion.

**IT IS THEREFORE BY THE COURT ORDERED** that the Motion of Defendant Jeff Cheek for Summary Judgment and Motion of Defendant John Cheek for Partial Summary Judgment (Doc. 86) are granted in part and denied in part. The court grants summary judgment to defendant John Cheek on the plaintiffs' 42 U.S.C. § 1983 claims arising prior to October 29, 1994, and on the plaintiffs' 42 U.S.C. § 1985(3) claim. The court grants summary judgment to defendant Jeff Cheek on the plaintiffs' 42 U.S.C. § 1983 claims arising prior to October 29, 1994, other than for violations of the Fourth Amendment, and on the plaintiffs' 42 U.S.C. § 1985(3) claim. The court denies summary judgment to the defendants on all other 42 U.S.C. § 1983 claims, and on the plaintiffs' claims for assault and battery.