William I. KOCH, et al., Plaintiffs,

v.

KOCH INDUSTRIES, INC., et al., Defendants.

No. 85–1636–SAC.

United States District Court, D. Kansas.

Feb. 17, 1998.

Clifford L. Malone, Adams, Jones, Robinson & Malone, Wichita, KS, Thomas E. Wright, Wright, Henson, Somers, Sebelius, Clark & Baker, L.L.P., Topeka, KS, Harry

L. Najim, Najim Law Offices, Wichita, KS, John T. Hickey, Jr., Alex Dimitrief, Kirkland & Ellis, Chicago, IL, Ellen A. Cirangle, Bartlit, Beck, Herman, Palenchar & Scott, Denver, CO, for William I. Koch.

Clifford L. Malone, Adams, Jones, Robinson & Malone, Wichita, KS, Thomas E. Wright, Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, Topeka, KS, Harry L. Najim, Najim Law Offices, Wichita, KS, John T. Hickey, Jr., Alex Dimitrief, Kirkland & Ellis, Chicago, IL, Fred H. Bartlit, Jr., Donald E. Scott, Ellen A. Cirangle, Bartlit, Beck, Herman, Palenchar & Scott, Denver, CO, for Oxbow Energy, Inc., Spring Creek Art Foundation, Inc., and Northern Trust Co.

Clifford L. Malone, Adams, Jones, Robinson & Malone, Wichita, KS, Harry L. Najim, Najim Law Offices, Wichita, KS, Gregory S.C. Huffman, L. James Berglund, II, Thompson & Knight, Dallas, TX, for L.B. Simmons Energy, Inc., Gay A. Roane, Ann Alspaugh, Paul Anthony Andres Cox, and Holly A. Andres Cox Farabee.

Clifford L. Malone, Adams, Jones, Robinson & Malone, Wichita, KS, Harry L. Najim, Najim Law Offices, Wichita, KS, Russell E. Brooks, Milbank, Tweed, Hadley & McCloy, New York City, for U.S. Trust Co. of New York and Frederick R. Koch.

Clifford L. Malone, Adams, Jones, Robinson & Malone, Wichita, KS, Harry L. Najim, Najim Law Offices, Wichita, KS, Gregory S. C. Huffman, Thompson & Knight, Dallas, TX, for Marjorie Simmons Gray and Marjorie L. Simmons.

Stephen M. Joseph, Redmond & Nazar, L.L.P., Wichita, KS, Michael P. Kirshner, P.L.L.C., Wichita, KS, for Louis Howard Andres Cox.

James M. Armstrong, Robert L. Howard, Timothy B. Mustaine, Foulston & Siefkin, L.L.P., Wichita, KS, Donald L. Cordes, Koch Industries, Inc., Wichita, KS, for Koch Industries, Inc. and Charles G. Koch.

James M. Armstrong, Robert L. Howard, Foulston & Siefkin, L.L.P., Wichita, KS, for Sterling V. Varner, David H. Koch, Donald L. Cordes, and Thomas M. Carey.

Michael W. Merriam, Gehrt & Roberts, Chartered, Topeka, KS, for KS Press Ass'n, KS Ass'n of Broadcasters, Wichita Eagle-Beacon, Topeka Capital-Journal, WIBW-TV, Kansas City Star Co., Wichita Business Journal, and Harris Enterprises, Inc.

Daniel R. Lykins, Bryan, Lykins & Hejtmanek, P.A., Topeka, KS, for Koch Crime Comm.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the defendants' "Motion To Strike Plaintiffs' New Claim Contained In The Court's Proposed Final Pretrial Order Under 'Itemization of Damages.'" (Dk. 660). The defendants argue the "plaintiffs have inserted a totally new claim, one never before raised and one which has the effect, if allowed, of substantially increasing plaintiff's actual damage claims." (Dk. 660, p. 1). The plaintiffs deny having added a new claim and insist they have only put numbers to a damage theory that has always been pleaded. In its order filed February 6, 1998, the court granted the defendants' motion and remarked that a subsequent order would follow explaining the ruling. (Dk. 675). Accordingly, the court deleted certain contested language from the pretrial order (Dk. 676) and now offers the following reasons and authorities for its ruling.[1]

**PROCEDURAL HISTORY**

In the last part of 1993, the parties submitted proposed pretrial orders and objections. The court suspended all further work on the pretrial order until it had decided the lengthy dispositive motions. After entering its summary judgment order, the court requested the parties to modify their proposed pretrial orders deleting or revising those claims, defenses, issues or arguments affected by the court's summary judgment ruling. When it received the parties' modified proposed pretrial order with objections, the

---

1. At the status conference on February 9, 1998, the defendants argued that their motion to strike also put in issue other language found in the plaintiffs' 1998 itemization. The court reserved its ruling and asked the parties to brief their positions on this issue.

court noted that the plaintiffs' itemization of damages would be revised upon receipt of a modified damages report from their damages expert at Patricof & Co. The court also directed the parties to brief several proposed issues of law.

On January 5, 1998, the plaintiffs filed their revised itemization of damages. The court attached to its order filed January 14, 1998, the parties' 1997 proposed pretrial order and the court's proposed final pretrial order. (Dk. 658). The court gave the parties until January 26, 1998, to file any written objections and/or comments concerning the court's suggested changes. On January 23, 1998, the defendants filed a motion to strike from the plaintiffs' latest itemization of damages any damages for the undervaluation of KII's disclosed earnings. (Dk. 660). On February 3, 1998, the plaintiffs filed and faxed to the judge's chambers their response to the defendants' motion to strike. (Dk. 673). On February 6, 1998, the defendants filed and faxed to the judge's chambers their reply brief. (Dk. 678)..

## CONTESTED PRETRIAL ORDER PROVISIONS

The plaintiffs' "Itemization of Damages" in the 1993 proposed pretrial order and in the 1997 proposed pretrial order, before any revision of the damages itemization, states in relevant part:

### 1. *Compensatory Damages as of June 1983*

Plaintiffs contend that the appropriate measure of damages is either (1) the difference between the price actually paid for their stock and the fair market value of KII stock sold on June 10, 1983, or (2) the incremental amount above $200/share (plus a share of the Santa Barbara offshore oil field) that the selling shareholders would have obtained in knowledgeable negotiations with KII for the sale of their stock, whichever is greater. In the event that the Court allows inquiry into KII's post 1985 financial condition, plaintiffs reserve the right to claim the benefit KII derived from fraudulently inducing the selling shareholders to sell.

The fair market value of KII's hidden or misstated assets and earnings at June 1983 was at least $83 per share (i.e. incremental value above the sales price). The derivation of this number is detailed in Patricof & Co.'s "Updated Report on Damages" (Nov. 4, 1992). Patricof & Co. utilized the reports of plaintiffs' other experts regarding particular assets, operations, and accounting practices to determine the amount of the understatements and omissions; deducted taxes; and weighted the understatements of assets and earnings, respectively, as the market would treat them in valuing KII stock. Patricof & Co. thus derived a fair market value of the misrepresented and/or undisclosed values equaling $58 per share, to which Patricof added a premium of 35–50%. The $83/share figure stated above utilizes the $58/share plus the middle of Patricof's premium range.

(Dk. 658, Attach., Parties' Proposed Pretrial Order, p. 10). The plaintiffs submitted in January of 1998 the following revised damages claim, which states in relevant part:

### 1. *Compensatory Damages as of June 1983*

Plaintiffs contend that the appropriate measure of damages is either (1) the difference between the price actually paid for their stock and the fair market value of KII stock sold on June 10, 1983, or (2) the incremental amount above $200/share (plus a share of the Santa Barbara offshore oil field) that the selling shareholders would have obtained in knowledgeable negotiations with KII for the sale of their stock, whichever is greater. In the event that the Court allows inquiry into KII's post 1985 financial condition, plaintiffs reserve the right to claim the benefit KII derived from fraudulently inducing the selling shareholders to sell.

(a) The fair market value of KII stock sold in June 1983 includes (in addition to the $200/share purchase price plus the Santa Barbara interest) the value of KII's hidden or misstated earnings and the undervaluation of KII's disclosed earnings resulting from defendants' misrepresenta-

tions and omissions related to the company's condition, performance and prospects.

The fair market value of KII's hidden or misstated earnings at June 1983 was at least $73.10 to $78.60 per share (*i.e.*, incremental value above the purchase price). The derivation of this number is detailed in Patricof & Co.'s "Revised Report on Damages" (Nov. 17, 1997).

KII's disclosed earnings were undervalued by plaintiffs because of defendants' misrepresentations and omissions about the condition, performance and prospects of the company, such as the statements made by defendants at the March 5, 1983 Board of Directors and shareholder meetings. The calculation of additional damages necessary to give plaintiffs the fair market value of the disclosed earnings is that shown on pages 5–6 of Patricof's Revised Report (Nov. 17, 1997).

(b) The incremental amount above $200 per share (plus a share of the Santa Barbara offshore oil field) that plaintiffs would have obtained in knowledgeable negotiations with KII for sale of their stock was at least $120 per share. Defendants' misstatements and omissions induced plaintiffs to underestimate KII's cash flow and its ability to borrow and repay debt for purchasing plaintiffs' stock.

(Dk. 658, Attach., Court's Proposed Final Pretrial Order, pp. 12–14). In granting the defendants' motion, the court struck the shaded [underlined] language from the final pretrial order. (Dk. 676).

## ARGUMENTS

The defendants say they anticipated the revised report from the plaintiffs' damages expert "would only contain revisions to conform with the Court's ruling on summary judgment." (Dk. 660, p. 2). The defendants note that the plaintiffs' damage claims increased from $83 per share to $120 per share, despite a summary judgment ruling that dismissed a number of the plaintiffs' claims. Multiplying this increase by the plaintiffs' 5.4 million shares results in a total damage increase of over $233 million.

The largest part of this increase is due to what the defendants' call the plaintiffs' "new claim" to recover damages for "the undervaluation of KII's disclosed earnings." (Dk. 660, p. 3). The plaintiffs' 1998 "Itemization of Damages" describes this new damages element as that "calculation of additional damages necessary to give plaintiffs the fair market value of the disclosed earnings." The defendants complain that these "additional damages" were "not contained in or even hinted at in the original 1992 Patricof report." (Dk. 660, pp. 3–4).

As understood by the defendants, this additional damages element comes from increasing the price-earnings ratio (P/E) used to value the disclosed earnings. The plaintiffs' selling price of $200 per share in 1983 analyzed with KII's 1982 financial statement yields a P/E ratio of 7.4. In Patricof's report of November 17, 1997, this fact is stated and then discussed as follows:

> Indeed, we would expect that in determining an acceptable price at which to sell their stock, selling shareholders would apply the same multiple to disclosed earnings as to undisclosed earnings. Our analysis has been limited to the effects on value of undisclosed information, and we did not undertake to identify the reasons why selling shareholders may have accepted a sale price equivalent to 7.4 times latest year disclosed earnings, a multiple that was below market and lower than what was appropriate for a company with KII's operating and financial characteristics. Among the possibilities explaining selling shareholders' acceptance of this sale price are that they were influenced to accept a price representing a 7.4 multiple by pessimistic representations by KII management. If the $200 per share sale price was influenced by misrepresentations by defendants, distinct from the undisclosed items analyzed herein, the incremental value for the purpose of damages is easily calculated by applying the appropriate market multiple to disclosed earnings (*i.e.* the difference between 9.0 times and 7.4 times reported 1982 net income of $26.98 per share.) Another possibility is that selling shareholders were influenced by the fact that $200 per share represented a multiple of 9.5 times projected fiscal 1983 net in-

come, according to KII's profit plan provided to the selling shareholders. In this event the effect of misrepresentations on value would be 9.5 times the total understatement of the 1983 profit plan. However, the foregoing considerations did not play a part in the quantitative conclusions reached in this report.

(Dk. 660, Attach., Patricof Report of November 17, 1997, pp. 5–6). The report simply speculates as to the plaintiffs' reasons for using a 7.4 P/E ratio in 1983 to value disclosed earnings. Even more interesting, the Patricof report says these additional damages considerations (disclosed earnings times 9.0 P/E) had no "part in the quantitative conclusions reached in the report," yet the plaintiffs added these damages to their proposed "Itemization of Damages" in the pretrial order.

According to the defendants, the 1992 Patricof report that calculated actual damages at $78 to $87 per share "was the only actual damage claim or evidence that plaintiffs had produced at the time discovery closed in this case in 1993." (Dk. 660, p. 5). The defendants complain they have received no discovery or prior notice from the plaintiffs of a damages claim based on the undervaluation of KII's disclosed earnings. As far as any argument that this damages claim is implicit in the plaintiffs' allegations of false and pessimistic representations concerning Pine Bend Refinery, the defendants argue the damages calculation is not limited to Pine Bend Refinery but is based on KII's entire operations. If asked to defend this latest damages claim now, the defendants claim they would be seriously prejudiced:

> Such a claim, that plaintiffs were misled into using too low a P/E ratio, would require an evaluation of the entire company and its components, including, but not limited to, oil and gas exploration, real estate, manufacturing, cattle, crude oil and natural gas gathering and processing, etc., in order to develop evidence as to the appropriate multiple to be used and/or whether plaintiffs were duped into applying a lower multiple. Quite obviously, defendants are not prepared to defend a claim such as this. The time for discovery has long ago

expired, the time for designating experts and submitting reports is over, and indeed, all witnesses have been named. It is simply too late for plaintiffs to now inject any new claim, let alone one of this magnitude.

(Dk. 660, pp. 6–7) (footnotes omitted). In short, the defendants argue that plaintiffs have never before disclosed that an element of their damages for fair market value of stock was a higher P/E ratio multiplied to the KII's disclosed earnings.

The plaintiffs respond that:

> The challenged language in the Court's Proposed Final Pretrial Order merely identifies two distinguishable (and individually quantifiable) components of that difference:
>
> (1) "the value of KII's *hidden* or misstated earnings," and
>
> (2) "the undervaluation of KII's *disclosed* earnings resulting from defendants' misrepresentations."
>
> Plaintiffs have consistently requested damages under this fair market value approach since the filing of their first Complaint in 1985 and, in fact, every version of plaintiffs' complaint has included such a claim. This claim has been set forth separately and in addition to plaintiffs' claim for damages based *solely* on the value of *undisclosed* assets and earnings.

(Dk. 673, pp. 2–3). The plaintiffs insist the defendants' motion is an effort to prevent them from measuring their damages by the fair market value of the stock they sold. The plaintiffs argue that their accounting claim impacts KII's "earning trends as a whole" and that their gloom and doom claim concerning Pine Bend Refinery reaches KII's refining business and necessarily impacts the valuation of refinery earnings and the overall valuation of KII.

The plaintiffs dispute the defendants' allegations of prejudice saying that the defendants deposed their damages expert after his 1992 report and asked about his use of a 9 P/E ratio for undisclosed earnings. The plaintiffs argue that their expert's most recent report simply clarifies an "apparent inconsistency between the implied price/earnings ratio of 7.4 for disclosed earnings and

his use of a price/earnings ratio of 9 for undisclosed earnings." (Dk. 673, p. 7). The plaintiffs maintain that the defendants' motion is untimely, because the expert's report was revised in November of 1997 and the defendants waited until January 23, 1998, to object. Finally, the plaintiffs insist that "[d]amages reflecting the undervaluation· of Koch Industries' disclosed earnings are fairly embraced or inherent in the plaintiffs' claims for damages measured on a 'fair market value' basis." (Dk. 673, p. 9).

**ANALYSIS**

■ As provided by Rule 16(c) of the Federal Rules of Civil Procedure, a district court may conduct pretrial conferences for purposes of taking "appropriate action" in "the formulation and simplification of the issues" and "the necessity or desirability of amendments to the pleadings." "Attorneys at a pre-trial conference must make a full and fair disclosure of their views as to what the real issues of the trial will be." *Erff v. MarkHon Industries, Inc.*, 781 F.2d 613, 617 (7th Cir. 1986) (citations omitted). "Just as a party may be bound by what he says at a pretrial conference, he also may be bound by what he fails to disclose." 6A Charles Alan Wright, et al., *Federal Practice and Procedure* § 1527, p. 265 (1990). "[T]he parties rely on the pre-trial conference to inform them precisely what is in controversy." *Erff*, 781 F.2d at 617 (citation omitted). Following a conference, "an order shall be entered reciting the action taken." Fed.R.Civ.P. 16(e).

■ "[T]he pretrial order measures the dimensions of the law suit at trial." *Stone v. First Wyoming Bank N. A., Lusk*, 625 F.2d 332, 347 (10th Cir.1980) (citation omitted); *see also Hullman v. Board of Trustees of Pratt Community College*, 950 F.2d 665, 668 (10th Cir.1991). A proper pretrial order should sharpen and simplify the issues for trial. *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 817 (10th Cir.1979). "[I]t represents a complete statement of all the contentions of the parties." *Id.* (quotation omitted). " 'The office [of the pretrial order] as a procedural tool [is] to insure the economical and efficient trial of every case on its merits without *chance or surprise.*' " *Smith v. Ford Motor Co.*, 626 F.2d 784, 795 (10th Cir.1980) (quot-

ing *Case v. Abrams*, 352 F.2d 193, 195 (10th Cir.1965)), *cert. denied*, 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981).

■ When entered after full discovery and upon the parties' agreement, the pretrial order controls "the subsequent course of the action." *Trujillo*, 608 F.2d at 817 (quotation omitted). Once the triable issues have been settled in the pretrial order, the court may reject issues and contentions not included and reject efforts to modify existing ones unless necessary to prevent manifest injustice. *Century Refining Company v. Hall*, 316 F.2d 15, 19 (10th Cir.1963). "[I]ssues not preserved in the pretrial order … [are] eliminated from the action." *Hullman*, 950 F.2d at 668 (quotation omitted). The decision to exclude facts or issues as not found in the pretrial order is committed to the trial court's sound discretion. *Smith*, 626 F.2d at 795.

■ Since it is intended to facilitate a trial on the merits, the pretrial order should not be used to defeat the lawsuit on a technicality or be construed "in the spirit of a common law pleading." *Trujillo*, 608 F.2d at 818. Instead, pretrial orders "should be 'liberally construed to cover any of the legal or factual theories that might be embraced by their language.' " *Id.* (quoting *Rodrigues v. Ripley Industries, Inc.*, 507 F.2d 782, 787 (1st Cir.1974)). " 'A policy of too-easy modification [of pretrial orders] not only encourages carelessness in the preparation and approval of the initial order, but unduly discounts it as the governing pattern of the trial. On the other hand, an unswerving insistence upon every provision, under all circumstances, may work grave injustice in individual cases ….' " *Perry v. Winspur*, 782 F.2d 893, 896 (10th Cir.1986) (quoting Honorable A. Sherman Christenson, The Pretrial Order, 29 F.R.D. 362, 371 (1961)). Indeed, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (citation omitted).

■ Following the completion of discovery, a conference with the court and meetings between counsel, the parties submitted to the court their proposed pretrial order with objections in 1993. The court understood, as should have the parties, that this proposed pretrial order was their complete and binding statement of all the issues and contentions in this case. Moreover, it should have been known and expected that any issue not stated or embraced by language found in the pretrial order would be viewed as no longer a part of the action. From that point forward, both the parties and the court rightfully relied on that proposed conference order to inform them precisely what matters were in controversy.

The court's review of the plaintiffs' "Itemization of Damages" in the 1993 proposed conference order reveals the following. First, it separately discusses the plaintiffs' recovery of compensatory damages as of June 1983 and their recovery of compensatory damages for time value of money. The current challenge is with the first category, and court will confine its comments to that category. Second, as set out in its first paragraph, the plaintiffs' 1993 itemization seeks to recover the greater of two alternative measures of damages and reserves the right to assert a third measure. The first measure is the difference between the selling price of the stock and its fair market value. The second measure is that incremental amount which the selling shareholders actually would have obtained in knowledgeable negotiations. The reserved third measure is the benefit that KII derived from fraudulently inducing the plaintiffs to sell. Third, as set out in its second paragraph, the plaintiffs' 1993 itemization appears to lay out some details about calculating the first alternative measure of damages (fair market value). Fourth, in that paragraph, the plaintiffs plainly allege a claim of $83 per share as the "fair market value of KII's hidden or misstated assets and earnings." Fifth, this allegation is followed by a direct reference to Patricof's 1992 report for the details on the derivation of this $83 figure. Sixth, the paragraph further explains that Patricof derived the "fair market value of misrepresented and/or undisclosed values equaling $58 per

share, to which Patricof added a premium of 35–50%." Seventh, the paragraph and this category of damages concludes with "[t]he $83/share figure stated above utilizes the $58/share plus the middle of Patricof's premium range." In short, for its fair market value measure of damages, the plaintiffs went to some length to identify the total damages sought, the manner of calculating those damages, the elements of those damages, and the reports of witnesses supporting those calculations.

As of the 1993 proposed conference order, the above was the plaintiffs' full and complete statement of its compensatory damages. Under their somewhat detailed allegations of the fair market value measure of damages, the plaintiffs make no mention of any calculation or element based on their undervaluation of KII's disclosed earnings. Even when liberally construed, the plaintiffs' 1993 itemization concerning the fair market value measure of damages cannot be read to embrace any element or calculation linked to the plaintiffs' undervaluation of disclosed earnings. There is nothing in the itemization that would reasonably lead one to believe the plaintiffs were seeking to recover under their fair market value measure anything other than the "value of KII's hidden or misstated assets and earnings."

Nor is this a case where a court might consider giving isolated emphasis to a broad construction of "fair market value" and ignoring all other language that limits the meaning of that same term. The plaintiffs have employed over a dozen skilled and experienced counsel to represent them in what should be characterized as contentious, long-pending and wide-ranging litigation. After submitting thousands of pages of filings in this case, the counsel have fully demonstrated their knowledge of the relevant law and their apparent skill in carefully and accurately articulating their clients' position. Under these circumstances, the court believes the meaning of "fair market value" damages in the plaintiffs' 1993 itemization is that which is plainly and exclusively articulated there: "the fair market value of KII's hidden or misstated assets and earnings." Consequently, the omission of other elements from

the plaintiffs' 1993 definition and description of "fair market value" damages was a matter of serious importance to all and a matter on which the defendants were entitled to rely.

Nor does Patricof's 1992 report reveal any numbers, theories, elements, or calculations based on the plaintiffs' undervaluation of disclosed earnings. When the defendants deposed the plaintiffs' damage expert from Patricof, Kenneth McGraw, in January of 1993, they limited their questions to McGraw's choice of a P/E ratio for calculating damages on undisclosed assets and earnings. In relevant part, McGraw testified as follows:

Q. Let me be sure I'm clear. The information that you are using here in XP 76 to come up with your opinion that a 9 times earnings ratio or 9—price/earnings ration of 9 times was appropriate, all of that information was available in May or June of 1983, is that right?

A. Yes, sir.

Q. You remember at the outset of this deposition when we were going through your work files, that someone in a handwritten note made a calculation that the actual buyout in June of 1983 was done at a price/earnings ratio of 7.4 approximately?

A. Yes, sir, I remember that.

Q. Okay. So it is apparent that the parties, even though this kind of information was available, did not use a 9 times price/earnings ratio?

A. Yes, sir.

Q. Have you made any analysis as to why?

A. No, sir. I don't know what was involved in the negotiations that resulted in the $200 price per share.

(Dk. 673, Ex. F, McGraw Dep. pp. 135–36). Besides not mentioning damages based on multiplying a higher P/E ratio to disclosed earnings, McGraw admitted in his deposition that he did not know what was involved in the parties' actual negotiations resulting in the $200 selling price and that he made no analysis of why the plaintiffs used a lower P/E ratio. From reading the 1992 Patricof report and from taking McGraw's deposition, the defendants had no reason to believe that the plaintiffs' fair market value measure of damages included the element of multiplying disclosed earnings to a higher P/E ratio.

The plaintiffs' 1998 "Itemization of Damages" based on Patricof's revised report dated November 17, 1997, made a substantial change to the plaintiffs' method of calculating their fair market value measure of damages. To their definition and description of this measure, the plaintiffs added the "undervaluation of KII's disclosed earnings." It also added the following paragraph describing this new element of damages:

KII's disclosed earnings were undervalued by plaintiffs because of defendants' misrepresentations and omissions about the condition, performance and prospects of the company, such as the statements made by defendants at the March 5, 1983 Board of Directors and shareholder meetings. The calculation of additional damages necessary to give plaintiffs the fair market value of the disclosed earnings is that shown on pages 5–6 of Patricof's Revised Report (Nov. 17, 1997).

(Dk. 658, Attach., Court's Proposed Final Pretrial Order, p. 13). This new element to the plaintiffs' fair market value measure of damages and the paragraph now describing it cannot be found in the plaintiffs' 1993 itemization and is not embraced by any general allegations found there.

Patricof's 1997 report represents itself to be the necessary result of the court's recent summary judgment ruling and additional information acquired by the plaintiffs in discovery since November 1992. Different from its 1992 report, Patricof's 1997 report now discusses using a multiple of 9 times disclosed earnings and now throws out some possible explanations for why the plaintiffs used the lower P/E multiple 7.4 in 1983. The addition of this new damage calculation is not a simple matter of clarifying an apparent inconsistency in Patricof's report. This damage calculation and the figures associated with it were never a part of Patricof's report until November of 1997. Neither the 1997 report nor the plaintiffs' other filings offer any

meaningful explanation or factual basis for the Patricof firm now adding this new damage calculation to the fair market value measure of damages. This new calculation is unrelated to the court's summary judgment ruling and has not been shown to be the result of any additional discovery obtained by the plaintiffs after November of 1992.

"[N]arrowing the issues and eliminating surprises are goals of discovery." *Hernandez v. George,* 793 F.2d 264, 267 (10th Cir. 1986). In a case of this magnitude and complexity, these discovery goals are particularly critical. The pretrial discovery of expert witnesses is essential in achieving these same goals. *See id.* Moreover, advance knowledge of the opposing expert witnesses' opinions and testimony "is necessary for effective cross-examination and rebuttal." *Id.; see Sil–Flo, Inc. v. SFHC, Inc.,* 917 F.2d 1507, 1518 (10th Cir.1990).

As far as the court can tell, nothing prevented Patricof from including this same damage calculation concerning disclosed earnings in its 1992 report. For that matter, the plaintiffs could have disclosed this new damage calculation anytime during 1994, 1995, 1996, or even the first half of 1997 and invited any additional discovery on this matter. Instead, the plaintiffs have waited until less than five months before trial to disclose the new damage calculation. It would be unduly prejudicial and patently unfair to the defendants if the court were to add the burden of discovery and preparation of a defense to this damage calculation at this late stage in trial preparation. Considering the effort and time of all that has gone into scheduling this trial, the alternative of granting a continuance is not a reasonable or compelling choice. Unlike the plaintiffs' lengthy and unjustified delay in disclosing this new damages element, the defendants have timely objected to this same element in the plaintiffs' 1998 itemization.[2]

IT IS THEREFORE ORDERED that the defendants' "Motion To Strike Plaintiffs'

New Claim Contained In The Court's Proposed Final Pretrial Order Under 'Itemization of Damages.'" (Dk. 660) is granted to the extent reflected in the final pretrial order (Dk. 676) and memorandum and order (Dk. 675) filed February 6, 1998.

---

2. The defendants did not have a compelling reason to object immediately to Patricof's 1997 report concerning this new damages element. The report itself says these additional damages considerations "did not play a part in the quantitative conclusions reached" there. (Dk. 660, Attach., Patricof Report of November 17, 1997, p. 6). Not until the plaintiffs actually inserted these same considerations into their 1998 itemization were the defendants on notice that the plaintiffs would be seeking this as an additional element of their damages claim.