**Curtis HENRY, et al., Plaintiffs,**

v.

**BOARD OF LEAVENWORTH COUNTY, COMMISSIONERS, et al., Defendants.**

**No. Civ.A. 98–2476–KHV.**

United States District Court, D. Kansas.

Aug. 4, 1999.

---

Sulaimon Adebayo Hassan, Hassan Law Firm, Chartered, Kansas City, KS, for Plaintiffs.

Michael T. Jilka, Wendell F. Cowan, Jr., Shook, Hardy & Bacon L.L.P., Barry E. Warren, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Overland Park, KS, Michael E. Waldeck, John L. Hayob, laura Thompson Goettsch, Niewald, Waldeck & Brown, P.C., Kansas City, MO, for Defendants.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiffs' action arises from the death of Curtis Henry, Jr. on October 19, 1996. Plaintiffs sue various officials and officers of Leavenworth County, Kansas,[1] the City of Lansing, Kansas,[2] and the City of Leavenworth, Kansas,[3] seeking to establish liability under 42 U.S.C. §§ 1983, 1985 and 1986 and state law. This matter comes before the Court on the *Motion Of Leavenworth County Board of Commissioners, Donald Navinsky, Herbert F. Nye, Charlie Yates, Edward Cummings, Michael Wehmeyer, William Eustice, Alfred Grenier And John Duncanson's Motion For Summary Judgment* (Doc. # 83) filed May 28, 1999; *Defendants City Of Lansing, Kansas, Michael Smith, Kenneth Bernard, And Steven Wayman's Motion For Summary Judgment* (Doc. # 86) filed May 28, 1992; the *Motion For Summary Judgment* (Doc. # 80) filed May 27, 1999 by the City of Leavenworth, H.B. Weeks and Lee Doehring; and plaintiffs' *Motion For Hearing On Defendants' Motion For Summary Judgment* (Doc. # 106) filed June 29, 1999.[4] The Court sustains plain-

---

1. Plaintiffs bring suit against the Leavenworth County Board of County Commissioners and Donald Navinsky, its chairman; Herbert F. Nye, sheriff of Leavenworth County; and six officers of the sheriff's department: Charlie Yates, Edward Cummings, Michael Wehmeyer, William Eustice, Alfred Grenier, and John Duncanson.

2. Plaintiffs bring suit against the City of Lansing, Kansas and Kenneth Bernard, its mayor; Michael Smith, Lansing police chief; and Steve Wayman, an officer with the Lansing police department. Plaintiffs also bring suit against officers Stan Hobbs and Randall Livengood, but these defendants do not appear and they contend that plaintiffs have not served them with process.

3. Plaintiffs bring suit against the City of Leavenworth, Kansas; H.B. Weeks, its mayor; and Lee Doehring, City of Leavenworth police chief.

4. Four additional motions are pending: the *Motion To Compel* (Doc. # 78) filed May 25, 1999 by Leavenworth County Board of Commissioners, Donald Navinsky, Herbert F. Nye, Charlie Yates, Edward Cummings, Michael Wehmeyer, William Eustice, Alfred Grenier and John Duncanson; plaintiffs' *Motion To Compel Answer* (Doc. # 89) filed June 7, 1999;

tiffs' motion for hearing[5] and for reasons stated below, sustains in their entirety the motions for summary judgment by the City of Lansing defendants and the City of Leavenworth defendants. Defendants' motions do not address all of plaintiffs' claims, however, and the Court is presently unable to grant summary judgment as to plaintiffs' entire case. Depending on the Court's further rulings, the other motions may be moot and the Court refrains from ruling on them at this time.

As noted, plaintiffs bring suit under 42 U.S.C. §§ 1983, 1985 and 1986 and state law. Plaintiffs' Section 1983 claim alleges that Sheriff Nye and Yates, Wehmeyer, Eustice and Grenier (officers in the county sheriff's department) violated (1) the Fourth Amendment by killing Henry and seizing his gun and knife without probable cause; (2) the Fifth Amendment by depriving Henry of life and taking his knife and gun without due process; (3) the Eighth Amendment by using unreasonable and excessive force and inflicting cruel and unusual punishment upon Henry by killing him; and (4) the Fourteenth Amendment by depriving Henry of his life, liberty and property without due process and by denying him equal protection of the laws.

Plaintiffs' Section 1985(3) claim alleges that the same defendants (Sheriff Nye and county officers Yates, Wehmeyer, Eustice and Grenier), along with county officer Duncanson, Lansing Police Chief Smith, Lansing officer Wayman, and Leavenworth Police Chief Doehring, made false police reports, manufactured evidence to sustain false statements, ordered junior officers not to write complete and detailed reports, and falsely claimed that Henry had shot officer Wehmeyer. Plaintiffs' Section 1986 claim alleges that the Leavenworth County Board of Commissioners, the City of Leavenworth, the City of Lansing, County Commissioner Navinsky, Mayor Bernard and Mayor Weeks knew or should have known about the cover up but failed to stop or prevent it.

Plaintiffs also bring state law claims on behalf of Henry's estate.[6]

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Smith v. Midland Brake, Inc.*, 138 F.3d 1304, 1307 (10th Cir.1998). The moving party bears the initial burden of showing that there is an absence of any genuine issue of

---

plaintiffs' *Motion To Enforce Subpoena, And To Compel Production Of Documents* (Doc. # 91) filed June 8, 1999; and *The Lansing Defendants' Motion In Limine* (Doc. # 98) filed June 18, 1999.

5. The Court held oral argument on defendants' motions for summary judgment on July 26, 1999.

6. Plaintiffs claim false arrest and imprisonment by Sheriff Nye and county officers Yates, Grenier and Eustice, alleging that they arrested Henry without legal justification. Plaintiffs claim battery against Sheriff Nye and county officers Yates, Grenier, Eustice and Cummings, on the ground that they ordered Henry's shooting and handcuffed him. Plaintiffs claim that the same defendants are liable for wrongful death to Henry's estate and parents. Plaintiffs also claim negligence by Sheriff Nye and county officers Yates and Grenier, for ordering use of a flash bang grenade in Henry's car and for killing him. Plaintiffs also allege that said defendants were negligent for failing to take reasonable care in attempting to remove Henry from his car. Plaintiffs also claim negligent supervision by Sheriff Nye, county officers Yates and Grenier, Lansing Chief Smith, Leavenworth Chief Doehring, the Leavenworth County Board of Commissioners, the City of Leavenworth, the City of Lansing, Commissioner Navinsky, Mayor Bernard and Mayor Weeks, asserting that they failed to properly train or supervise their employees in the use of deadly force. Plaintiffs also bring claims of trespass and outrageous conduct. Plaintiffs do not state which defendants these claims are asserted against, nor do they include any factual allegations concerning the elements of the claims.

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets its burden, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

In considering a summary judgment motion the Court must view the evidence in the light most favorable to the nonmoving party. *Tom v. First Am. Credit Union*, 151 F.3d 1289, 1291 (10th Cir.1998). Summary judgment may be granted, however, if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. Thus, " '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,' summary judgment in favor of the moving party is proper." *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### Facts[7]

■ Before providing the relevant facts, the Court notes two issues raised by defendants' motions for summary judgment. First, before reciting their statements of facts under D.Kan.Rule 56.1, all defendants set forth lengthy discussions about the facts of this case. The Court, however, disregards all factual statements which are presented in a format that does not comply with D.Kan.Rule 56.1. In addition, the City of Leavenworth defendants rely almost exclusively on police reports, without showing that these reports meet any hearsay exception. To that extent, when defendants offer the reports for the truth of the matter asserted, the reports are hearsay and thus inadmissible, and the

Court also disregards them. *See Lancaster v. Independent School Dist. No. 5*, 149 F.3d 1228, 1236 (10th Cir.1998); *United States v. McIntyre*, 997 F.2d 687, 698–99 (10th Cir.1993) (documents offered for truth of statements they contain are hearsay); Fed.R.Evid. 801(c). On the other hand, as discussed below regarding officer Eustice, defendants sometimes cite the reports to establish what officers believed on the night of the incident, not for the truth of the statements in the reports. To this extent, the reports do not constitute hearsay. *See Webb v. ABF Freight System, Inc.*, 155 F.3d 1230, 1248 (10th Cir.1998); Fed.R.Evid. 801. Finally, the record includes extensive material which the parties do not include in their statements of undisputed facts. Also, in their motions and at oral argument, the parties have often referred the Court to evidence which is not found in their statements of undisputed facts. The Court has therefore scoured the record and includes its own factual allegations which are supported by uncontroverted record evidence.[8]

On October 19, 1996, Curtis Henry, Jr. confronted Shammara Stuteville (now Van-Guerrin), who was using a pay telephone located outside the Western Sizzlin Restaurant. The restaurant was located at 5401 South Fourth Street in the City of Leavenworth, Kansas. During the confrontation, Henry brandished a knife and threw Stuteville to the ground. Stuteville and Henry went to his car, where Henry pulled out a covered object which Stuteville believed to be a rifle. Henry also confronted Stuteville's twin sister, Salima, and pointed a rifle at her. Salima heard Henry fire the rifle into the air.

An individual called 911 and reported the incident to the police department for the City of Leavenworth. The Leavenworth County sheriff's department then issued a bulletin which asked law enforce-

---

7. The following facts are uncontroverted or, where controverted, viewed in the light most favorable to the nonmoving party.

8. The Court is not obligated to scour the record for evidence, see *Gross v. Burggraf*

*Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995), and in doing so, it is essentially doing the work of counsel. Because the parties' factual statements have omitted key evidence, the Court has taken this step to ensure justice.

ment agencies to stop a vehicle which matched the description of Henry's car.[9] The sheriff's department also dispatched Lansing police officer Brian Duncan to assist in responding to the call. The sheriff's department informed Duncan that the suspect was driving a yellow Ford Escort southbound on Fourth Street. Duncan was proceeding to the crime scene when he observed Henry driving a cream Ford Escort southbound on Main Street. Duncan pursued Henry southbound on Highway 73.[10] Lansing police officers Stan Hobbs, Randall Livengood and Steven Wayman also pursued Henry. Hobbs was alone in one patrol car while Livengood and Wayman shared another patrol car. As Duncan pursued the Ford Escort, he knew that Henry had been involved in an armed disturbance at the restaurant. He also saw a muzzle flash and heard a "bang" or "thud," after which time a hole appeared in the rear window of Henry's car. As a result, Duncan thought that Henry had shot at him.[11] Duncan then saw another flash reflect off Henry's windshield and saw the remaining glass in Henry's back window fall out. Duncan therefore believed that Henry had shot at him a second time. Officer Wayman saw Henry raise his rifle and fire a third shot, out the passenger window of the car.[12]

At the intersection of Highway 73 and Hollingworth Road, Henry pulled his car over to the right shoulder of the road. Duncan, Hobbs and Wayman all parked their cars approximately 30 yards behind his car. Duncan and Wayman ordered Henry to exit his car and surrender, but Henry did not respond. Lansing police chief Mike Smith arrived at the scene within seconds after Duncan and Wayman. Wayman pointed his gun at Henry's car, but the record contains no evidence that he fired it.[13] Officers with the City of Leavenworth police department reported that "[s]ubject in the vehicle is disabled and they're trying to stand him up."

9. In making these allegations, the City of Lansing and Leavenworth County cite police records as evidentiary support. Plaintiffs assert that these documents constitute hearsay, but the Court finds that the records are admissible to show defendants' state of mind in pursuing Henry. *See Webb,* 155 F.3d at 1248. Defendants do not assert that any statements contained in the records are true; they merely assert that the statements were made and caused defendants to begin pursuing Henry. The record does not explain why the Leavenworth County sheriff's department responded to the 911 call to the City of Leavenworth, or by what authority it dispatched Lansing police officer Brian Duncan to assist in responding to the call.

10. Main Street is also referred to as Fourth Street, which turns into Highway 73, which is also referred to as Highway 7.

11. Duncan did not actually see Henry fire the shot, but he attaches an affidavit which states that Henry shot at him. Plaintiffs argue that the Court must disregard the affidavit because it is inconsistent with Duncan's deposition testimony that he did not see Henry shoot at him. *See Franks v. Nimmo,* 796 F.2d 1230, 1237–38 (10th Cir.1986). Duncan's deposition testimony is arguably more favorable to plaintiffs and for purposes of this motion, the Court will use Duncan's deposition testimony rather than his affidavit. As discussed below, however, the Court finds no relevant difference between the two. Even after examining Duncan's deposition testimony, no rational trier of fact could disagree that Henry shot at Duncan.

12. Plaintiffs attempt to controvert this fact by alleging that Wayman did not know what kind of weapon Henry had and that Wayman believed Henry had a shotgun. These allegations, however, do not controvert Wayman's allegation that he saw Henry shoot out the passenger window.

13. Plaintiffs allege that Duncan also drew his gun and may have pointed it at Henry. Plaintiffs refer to page 57 of Duncan's deposition, but this page does not discuss any such fact. Indeed, as near as the Court can tell, plaintiffs are referring to page 57 of another officer's deposition, because plaintiffs provide a page 57 which discusses an officer drawing his gun and possibly pointing it at Henry. Plaintiffs' exhibits, however, are not separated by tabs or any other means; plaintiffs simply provide various pages of different depositions, forcing the Court to try to determine what pages of testimony go with what deponent. From what the Court can deduce, the page 57 to which plaintiffs refer comes from Wayman's deposition, not Duncan's.

*Plaintiff's Response To Defendants' Motion For Summary Judgment* (Doc. # 101) filed June 21, 1998 at Ex. 1, Bate Stamp 209.[14]

Law enforcement officials from Lansing, Leavenworth, Leavenworth County, and Kansas City, Kansas agreed that the Leavenworth County sheriff's department had jurisdiction over the scene and Sheriff Nye therefore assumed control of the team. A police negotiator began contacting Henry and attempted to get him to respond and surrender to the officers. Henry did not respond, but officer Alfred Grenier, a sharpshooter for the Leavenworth County sheriff's department, was stationed on top of a patrol car and observed Henry move his head slightly on occasion during the standoff. Likewise, Nye stated that Henry made occasional slight head movements. Officer Eustice also observed Henry's head moving from time to time. Lansing officer Bledsoe, however, reported that he did not observe Henry move during the entire time. Around 11:00 p.m., Sheriff Nye concluded that efforts to get Henry to voluntarily exit the car were fruitless. He therefore ordered the Leavenworth County Tactical Assistance Group ("TAG") to arrest Henry. Between the time when Henry pulled over and the time when Nye deployed the TAG members, no officers heard any gunshots from Henry's vehicle.

Sergeant Charles Yates advised the TAG members that Henry was not moving much and that he might have shot himself. Officers attempted to contact Henry but Henry did not respond. TAG members approached Henry's car. Officers Wehmeyer, Eustice and Cummings approached from the rear of the vehicle on the driver's side, and Wehmeyer deployed a flash bang device through the broken rear window.[15] The grenade exploded and emitted smoke which filled up Henry's car. Officer Michael Wehmeyer opened the driver's door. As Wehmeyer attempted to grab Henry, Wehmeyer saw a flash from Henry's lap area inside the car, and Wehmeyer sustained a gunshot wound to his left wrist. Wehmeyer fell backwards and yelled that Henry had shot him.[16]

Officer William Eustice was involved in the TAG arrest attempt and approached from the driver's side and rear of the car. After seeing Wehmeyer open the door, Eustice heard two gunshots and heard Wehmeyer yell that he had been shot. Eustice then saw a rifle stock inside Henry's car and saw Henry moving forward. Eustice fired his weapon at Henry and saw Henry's head slump forward.[17]

14. Defendants challenge plaintiffs' use of the police transcript as hearsay. Plaintiffs attempt to fit the transcript within the public records exception. Transcripts such as this are not public records that fall within the hearsay exception, however, because they do not set forth factual findings resulting pursuant to any evaluative process. *Crawford v. City of Kansas City*, 952 F.Supp. 1467, 1472 (D.Kan.1997) (citing *United States v. D'Anjou*, 16 F.3d 604, 610 (4th Cir.), cert. denied, 512 U.S. 1242, 114 S.Ct. 2754, 129 L.Ed.2d 871 (1994)). To the extent that plaintiffs rely on the statement for its truth, it is inadmissible. To the extent that plaintiffs rely on the statement to show defendants' state of mind, however, it is admitted.

15. The record does not reveal where all TAG members positioned themselves during the approach.

16. Like Duncan, Wehmeyer attaches an affidavit which states that Henry shot him.

Plaintiffs again argue that Wehmeyer's affidavit is contrary to his deposition testimony. As with Duncan, the Court uses Wehmeyer's deposition testimony, but as discussed later, even this evidence compels a reasonable finder of fact to conclude that Henry shot Wehmeyer.

17. The City of Leavenworth defendants provide Eustice's report, which states that he also shot Henry. Because defendants offer this statement for the truth of the matter asserted, it constitutes hearsay and defendants do not show that it meets any exception. Plaintiffs concede, however, that Eustice shot Henry and saw his head slump forward. *See Plaintiffs' Response To Defendants' Motion For Summary Judgment* (Doc. # 101) at 11. Plaintiffs object to the remainder of Eustice's report as hearsay, but defendants' allegations and the portions of the report which the allegations rely upon regard what Eustice perceived immediately prior to shooting Henry. This evidence

Officer Grenier saw Wehmeyer retreat from the vehicle and announce that Henry had shot him. Grenier heard a bang, followed by a small pause, and then another bang. Believing that Henry indeed had shot Wehmeyer, Grenier concluded that others were in immediate danger of harm as well.[18] Therefore, from his position on top of a Lansing police car, Grenier also shot Henry.

TAG members pulled Henry from the car and handcuffed him in accordance with Leavenworth County's standard practice of handcuffing all arrestees. Dr. Allen Hancock, the coroner for Wyandotte County, Kansas, pronounced him dead at the scene.

On October 25, 1996, Special Agent Currie Myers with the Kansas Bureau of Investigation searched Henry's car.[19] By this time, the car had been towed to a police impound lot in Basehor, Kansas. Myers located three fired cartridges from a .22 rifle. Robert Cilwa, a forensic scientist with the KBI, compared the fired cartridges with Henry's rifle and found that two of the cartridges were fired from Henry's rifle. Cilwa found that the third cartridge possessed "the same class characteristics as tests from [Henry's] rifle, but [that it] lack[ed] sufficient matching individual characteristics for a positive identification," and his finding was therefore inconclusive.

After the shooting, a supervising officer at the Lansing police department told Lansing police officer Todd Bledsoe not to put much detail in his report because the Leavenworth County sheriff's department was in control of the incident. At his deposition, Bledsoe reported that the glass in Henry's rear window was not completely blown out, but that there was a hole near the middle, with glass fragments still attached to the window frame.[20]

Lansing police officers did not participate in the decision to utilize Leavenworth County's TAG or approach Henry's car. In fact, they did not know about the plan until they saw TAG members approaching Henry's car. Nor did they participate when Leavenworth County officers deployed the diversion device, removed Henry from his car and handcuffed him.

H.B. Weeks, mayor of the City of Leavenworth, and Kenneth Bernard, mayor of the City of Lansing, were not at the scene of the incident. Mayor Bernard did not learn about it until the next day. The record does not reveal whether County Commissioner Navinsky was present at the scene.

shows what Eustice believed when he shot Henry and is not offered for the truth of the statements.

18. Plaintiffs controvert this allegation by alleging that Henry did not shoot Wehmeyer. Even if this allegation was true, it does not controvert Grenier's statement that he *believed* Henry had shot Wehmeyer.

19. Plaintiffs provide reports subpoenaed from the KBI. While plaintiffs attempt to fit these reports with the public records exception, they provide only the affidavit of plaintiffs' counsel, who states that the KBI "represented" to him that the documents were prepared close to the time of the occurrence and during the course of official KBI business. Counsel's affidavit, however, is hearsay. He provides no admissible evidence—such as an affidavit from a KBI employee with knowledge—that the documents meet the public records exception. As discussed below, however, even if

the Court ignores the hearsay problem and considers the evidence for its truth, it does not change the Court's decision on the pending motions.

20. Plaintiffs allege that other officers falsely reported that the glass Henry's rear window had been blown out, while Bledsoe correctly reported that the glass was intact with only a "small hole near the middle." *See Plaintiffs' Response To Defendants' Motion For Summary Judgment* (Doc. # 101) at 7. First, plaintiffs materially misstate Bledsoe's testimony, which no reasonable jury could interpret as stating that the window only had a "small hole." Second, plaintiffs cite no evidence that other officers reported that the rear window glass was blown out. The City of Leavenworth defendants provide Duncan's report, which stated that Henry's entire rear window had been blown out during the car pursuit. The discrepancy does not raise a genuine issue of material fact for trial.

Defendants concede that it would be quite natural for Henry to have inhaled some of the smoke from the grenade, but his autopsy report does not mention whether his lungs were filled with smoke. The report states only that Henry was burnt on one arm.

## Analysis

### A. Section 1983

Mayors Bernard and Weeks, city police chiefs Smith and Doehring, and Lansing police officer Wayman claim that they are entitled to summary judgment because plaintiffs cannot show that they individually violated Henry's constitutional rights. Defendants first note that in the pretrial order, plaintiffs wholly fail to identify what constitutional rights these defendants apparently violated. The pretrial order includes only the following statement regarding these defendants:

> Plaintiffs assert the claims under 42 U.S.C. § 1983 because defendants Defendants [sic] Herbert Nye, Charlie Yates, Michael Wehmeyer, William Eustice, Edward Cummings, Alfred Grenier, H.B. Weeks, Lee Doehring, Kenneth Bernard, Michael Smith, Steve Wayman, and John Duncanson individually and jointly were acting under color of State law. Defendants conducts [sic] are willful and intentional.

*Pretrial Order* (Doc. # 79) filed May 27, 1999 at 7. These defendants argue that they are entitled to summary judgment because plaintiffs fail to identify what specific constitutional rights they allegedly violated. *See Morris v. State of Kan. Dept. of Revenue,* 849 F.Supp. 1421, 1426 (D.Kan.1994) (citing *Codd v. Brown,* 949 F.2d 879, 882 (6th Cir.1991)); *see also Wise v. Bravo,* 666 F.2d 1328, 1333 (10th Cir.1981) ("Constitutional rights allegedly invaded, warranting an award of damages, must be specifically identified. Conclusory allegations will not suffice").

The pretrial order is indeed lacking in specific allegations against these defendants, and on this ground alone the Court might properly sustain their motions for summary judgment. The Court must balance the fact of plaintiffs' omission, however, against the liberal pleading requirements that govern practice in federal courts. As another court in this district recently stated:

> Since it is intended to facilitate a trial on the merits, the pretrial order should not be used to defeat the lawsuit on a technicality or be construed in the spirit of a common law pleading. Instead, pretrial orders should be liberally construed to cover any of the legal or factual theories that might be embraced by their language. A policy of too-easy modification of pretrial orders not only encourages carelessness in the preparation and approval of the initial order, but unduly discounts it as the governing pattern of the trial. On the other hand, an unswerving insistence upon every provision, under all circumstances, may work grave injustice in individual cases.... Indeed, the Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits.

*Koch v. Koch Industries, Inc.,* 179 F.R.D. 591, 596 (D.Kan.1998) (further citations and quotations omitted). In the pretrial order, plaintiffs set out detailed allegations concerning the events leading up to Henry's death. Construing plaintiffs' factual contentions in combination with plaintiffs' legal theories, defendants cannot convincingly argue that they do not understand what actions plaintiffs are challenging and what specific constitutional rights plaintiffs are asserting.

Plaintiffs assert that Henry's death violated the Fourth, Fifth, Eighth, and Fourteenth Amendments, and they set forth factual allegations which include some of these defendants. Even though plaintiffs do not expressly attribute specific constitutional violations to these defendants, it is clear that plaintiffs assert that these defendants were involved in Henry's death.[21]

**21.** To the extent that plaintiffs intended to assert additional factual allegations or claims

The true issue, then, is whether on the merits these defendants had personal involvement in the alleged constitutional violations.

■ Neither the pretrial order nor plaintiffs' evidence suggests that Mayors Bernard and Weeks and city police chiefs Smith and Doehring had personal involvement in the actions which plaintiffs allege. To prevail on a claim for damages for a constitutional violation pursuant to 42 U.S.C. § 1983, plaintiffs must establish that defendants acted under color of state law and caused or contributed to the alleged violation. *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir.1996) (citing *Ruark v. Solano*, 928 F.2d 947, 950 (10th Cir.1991); *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir.1990); *Bennett v. Passic*, 545 F.2d 1260, 1262–63 (10th Cir.1976)). Plaintiffs must show that these defendants personally participated in the alleged violation. *Jenkins*, 81 F.3d at 994. Mayor Bernard and Mayor Weeks were not present when Henry was killed, and plaintiffs provide no evidence which suggests that Chief Doehring was present. Plaintiffs also provide no evidence that either Chief Smith or Chief Doehring was involved in the decisions which led up to Henry's death. The evidence establishes that the Leavenworth County sheriff's department assumed control of the scene, not the city police departments for Leavenworth or Lansing.

■ Plaintiffs apparently seek to impose liability on the mayors and city police chiefs because of their positions, which to some extent are supervisory. A supervisory position alone is insufficient for liability, however, because " 'there is no concept of strict supervisor liability under section 1983.' "*Jenkins*, 81 F.3d at 994 (quoting

*Ruark*, 928 F.2d at 950) (further citations and quotations omitted). "In other words, it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation. Instead, just as with any individual defendant, the plaintiff must a establish 'a deliberate, intentional act by the supervisor to violate constitutional rights.' " *Jenkins*, 81 F.3d at 994–95 (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1399 (10th Cir.1992)) (further citations and quotations omitted). Plaintiffs produce no evidence of any actions by the mayors or police chiefs which caused Henry's death or the seizure of his property. No reasonable jury could find that these defendants violated Henry's constitutional rights.

■ Plaintiffs suggest, however, that a factual dispute precludes summary judgment for Wayman. Plaintiffs apparently theorize that Wayman shot and killed Henry soon after he pulled his car off the road, and that Henry was already dead when TAG members decided to arrest him. Plaintiffs base this theory on the following facts: (1) Wayman was one of the first officers at the scene, and he pointed his weapon at Henry's car; (2) the City of Leavenworth police report shows that before the TAG members decided to arrest Henry, police stated that "[s]ubject in the vehicle is disabled and they're trying to stand him up"; and (3) if Henry had been alive when the flash bang device exploded, he would have inhaled smoke, yet the autopsy makes no note of smoke inhalation.[22] Plaintiffs argue that such evidence would allow a reasonable jury to find that Wayman used excessive force by killing Henry before TAG members decided to place him

---

for constitutional violations against these defendants, plaintiffs failed to do so in the pretrial order, and plaintiffs have waived any other factual allegations or legal theories. "[I]ssues not preserved in the pretrial order ... [are] eliminated from the action." *Koch*, 179 F.R.D. at 596 (quoting *Hullman v. Board of Trustees of Pratt Community College*, 950 F.2d 665, 668 (10th Cir.1991)).

**22.** Plaintiffs also allege that defendants did not see Henry make any movement within the car during the entire standoff. Plaintiffs cite deposition testimony as support, but the Court cannot find any of the deposition pages which plaintiffs cite. *See Plaintiffs' Response To Defendants' Motion For Summary Judgment* (Doc. # 101) at 13. In fact, the record shows that officers Nye, Eustice and Grenier all saw plaintiff move.

under arrest, and before he allegedly shot officer Wehmeyer.

The Court disagrees. Plaintiffs' "evidence" that Wayman shot Henry amounts to sheer speculation. While Henry's autopsy admittedly makes no note of smoke inhalation, the record contains no evidence that the examining pathologist looked for evidence of smoke inhalation, or that an autopsy would have revealed evidence of smoke inhalation from a device of the kind which defendants deployed in this case. Therefore the autopsy report does not suggest that Henry was dead before TAG members used the flash bang device. In addition, because plaintiffs cite the police report for the truth of the matter asserted (that Wayman "disabled" Henry), plaintiffs' evidence is hearsay. In addition, even if the Court considers the report, it does not support a reasonable inference that Henry was dead before TAG members used the flash bang device. The report, frankly, is ambiguous. The author of the report was apparently not deposed, and the record contains no affidavit regarding his report. None of the deposition testimony which *is* a part of the record confirms any aspect of plaintiffs' theory that officers "disabled" plaintiff, then "tried to stand him up." When the report is viewed in light of the entirety of the other record evidence, a reasonable jury could not find that Lansing officers "disabled" Henry, then tried to stand him up outside the car. A literal interpretation of the report would not be reasonable in this

case. As mentioned, the record contains no confirmation for any theory that Wayman actually fired his gun, that officers removed Henry from the car or tried to stand him up, or that trained police officers would customarily try to force a disabled gunshot victim to stand up. More importantly, however, plaintiffs' theory of events is inconsistent with uncontroverted evidence that Henry later shot Wehmeyer from inside the car.

In short, when plaintiffs' evidence is combined with other record evidence, a reasonable jury would necessarily reject plaintiffs' theory that Wayman shot and killed Henry before TAG members decided to arrest him.[23] Plaintiffs' theory is defeated by the undisputed fact that two hours after Wayman allegedly killed Henry, Henry shot Wehmeyer in the wrist. Plaintiffs argue that this "fact" is controverted, and provide evidence that Wehmeyer did not "see" Henry shoot him.[24] Based on the record evidence, however, plaintiffs cannot reasonably assert that Henry did not shoot Wehmeyer. In his deposition, Wehmeyer testified that he believed that Henry shot him because he observed a flash from Henry's lap area inside the car and he immediately sustained a gunshot wound. Plaintiffs produce no evidence to suggest that *someone else* shot Wehmeyer. Plaintiffs theorize that because numerous armed police officers were present, a jury could reasonably conclude that one of them accidentally shot Wehmeyer in a burst of cross-fire.[25] Such

**23.** Plaintiffs argue that the Court must not weigh the credibility of witnesses or resolve factual disputes in deciding the present motions for summary judgment. The Court agrees, but notes that the summary judgment process requires the Court to look at the record as a whole to determine whether the evidence presented would allow a reasonable jury to find for plaintiffs. *Thomas,* 48 F.3d at 484. In other words, the Court does not look at plaintiffs' evidence that Wayman shot Henry as if it exists in a vacuum; the Court considers all record evidence in determining what inferences are reasonable.

**24.** In addition, Eustice reported that he saw Henry move after Wehmeyer was shot. The

Court cannot rely on his statement, however, for its truth; it can only rely on this statement to explain why Eustice shot Wehmeyer. This statement therefore cannot be used to controvert plaintiff's claim that Henry did not shoot Wehmeyer.

**25.** At oral argument on the motions for summary judgment, defense counsel for Leavenworth County asserted that the record shows that a cross-fire was not possible, because officers on the passenger side of Henry's car did not advance far enough to create a risk of cross-fire. Having searched the record, however, the Court finds no admissible evidence—i.e., nonhearsay—that supports this allegation.

a theory, however, is complete conjecture. None of the parties in this case have presented evidence which confirms or refutes the existence of any cross-fire.

Plaintiffs also rely on the fact that the KBI found only three spent .22 rifle casings in Henry's car, even though defendants contend that Henry shot a total of five possible shots—one or two at officer Duncan, one at Henry's passenger side window, one at Wehmeyer, and one to his own head. First, plaintiff's evidence does not conclusively establish that Henry only fired three shots. A reasonable jury could find that other cartridges were lost during the car chase or when Henry's car was towed to the impound lot. Likewise, the fact that the KBI matched only two of the three cartridges with Henry's rifle does not establish that he only fired two shots; the KBI report was inconclusive regarding the third cartridge. In addition, even if Henry only fired two shots, one of these could have been at Wehmeyer. The evidence is clear that Wehmeyer was shot. Wehmeyer provides the only evidence in the record which suggests where the shot came from—Henry's lap. Plaintiffs have no contrary evidence to suggest that the shot came from any other source and plaintiffs' evidence establishes that Henry did shoot the rifle while in the car. Without evidence that a cross-fire occurred, reasonable minds would necessarily conclude from officer Wehmeyer's testimony that Henry shot him when he attempted to extricate him from the car.

Because a reasonable jury could only conclude that Henry shot Wehmeyer at approximately 11:00 p.m., plaintiffs' speculative evidence that Wayman killed Henry approximately two hours earlier is insufficient to create a genuine issue of material fact. *See Thomas*, 48 F.3d at 484 (summary judgment appropriate when whole record prevents rational trier of fact from finding for nonmoving party). Wayman is therefore entitled to summary judgment on plaintiffs' Section 1983 claim.

■■■ Sheriff Nye and county officers Yates, Wehmeyer, Eustice and Grenier also challenge plaintiffs' Section 1983 claim and argue that they similarly did not violate Henry's constitutional rights. While plaintiffs allege that defendants' conduct violated the Fourth, Fifth, Eighth and Fourteenth Amendments, both parties agree that the Fourth Amendment provides the proper standard for reviewing defendants' conduct.[26] *See Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard"). In addressing an excessive force claim, the Court must ascertain whether the arresting officer's actions were objectively reasonable in light of the facts and circumstances confronting him.[27] *See Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The Court judges the reasonableness of the force used not with $^{20}\!/_{20}$ hindsight, but from the perspective of the officer at the scene, allowing for the split-second nature of many law enforcement decisions. *See Latta v. Keryte*, 118 F.3d 693, 701 (10th Cir.1997) (citing *Graham*,

**26.** Both parties focus on plaintiffs' claim of excessive force and ignore their claims that the Leavenworth County defendants violated Henry's Fourth and Fifth Amendment rights by seizing his gun and knife. *See Pretrial Order* (Doc. # 79) filed May 27, 1999 at 8. The Court is not sure what to make of this failure, because the Leavenworth County defendants are obviously seeking summary judgment on plaintiffs' entire Section 1983 claim, yet fail to mention the taking issue. On the other hand, plaintiffs were aware that defendants sought summary judgment on the entire Section 1983 claim, yet failed to note that defendants' omission would prevent summary judgment on the entire claim.

**27.** In the excessive force context, the reasonableness inquiry is the same for purposes of Fourth Amendment and qualified immunity defense analyses. *See Jarrett v. Schubert*, No. Civ. A. 97–2628–GTV, 1998 WL 471992 at *3 (D.Kan. Jul. 31, 1998) (citing *Mick v. Brewer*, 76 F.3d 1127, 1135 n. 5 (10th Cir.1996)).

490 U.S. at 396–97, 109 S.Ct. 1865). "Relevant factors in determining whether the force used by an arresting officer was objectively reasonable include the severity of the crime, whether the subject posed an immediate threat to the safety of the officer, and whether the subject was resisting arrest." *Id.* (citing *Wilson v. Meeks,* 52 F.3d 1547, 1553 (10th Cir.1995)). The use of deadly force is justified under the Fourth Amendment "if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Sevier v. City of Lawrence,* 60 F.3d 695, 699 (10th Cir.1995). "The reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Id.*

## 1. Severity of the Crime

Defendants first argue that Sheriff Nye, as officer in charge of the scene, had probable cause to believe that Henry had committed serious felonies, including aggravated assault on a law enforcement officer, and that he reasonably deployed the force which resulted in Henry's death. Plaintiffs respond that at most, Henry's conduct at the Western Sizzlin restaurant amounted to misdemeanor offenses. The Court disagrees. Defendants understood that Henry had brandished a knife and fired a gun while threatening Shammara and Salima Stuteville. Based on this information, defendants had reason to believe that Henry had committed aggravated assault, a felony in Kansas. *See* K.S.A. § 21–3410.

Plaintiffs argue that defendants could not reasonably believe that Henry had committed aggravated assault on a law enforcement officer because Duncan did not actually see Henry shoot him and Sheriff Nye and Duncan could only speculate that Henry *had* shot him. Duncan testified, however, that he believed Henry had shot at him. He knew that Henry had been involved in an armed disturbance at the restaurant. He saw a muzzle flash, saw a hole appear in the rear window of Henry's car, and heard a "bang" or "thud." Plaintiffs do not deny that a *someone* fired a shot on Duncan. They provide no evidence which suggests that Henry was not the shooter; they merely challenge Duncan's belief as speculative. At best, plaintiffs' evidence is that the KBI recovered only three fired .22 casings and, therefore, Henry could not have shot at defendants as many times as they claim. While this evidence challenges defendants' version of events, plaintiffs fail to introduce any evidence regarding who else could have shot at Duncan. Their argument would require a jury to conclude that the shooter was an unknown gunman who disappeared from the scene without a trace. As with the shooting of Wehmeyer, based on the record evidence, a reasonable jury could only conclude that Henry shot at Duncan's car.

Even assuming that plaintiffs have introduced adequate evidence to allow a reasonable jury to conclude that Henry did not shoot at Duncan, plaintiffs provide absolutely no evidence that defendants were aware of this fact—*i.e.,* that defendants did not reasonably believe that Henry had shot at Duncan. Plaintiffs apparently challenge the entirety of defendants' version of events by alleging that defendants destroyed evidence and gave false reports. Plaintiffs ask the Court to take judicial notice of the false reports provided by New York City police in the Abner Louima case, and allege that "it is a well known fact that police officers across the United States are known to lie about their misdeeds, particularly in cases involving African Americans." *See Plaintiffs' Supplement To Their Response To Defendants Motion For Summary Judgment* (Doc. # 110) at 4. While the facts in the Louima case show intolerable conduct by police officers, plaintiffs provide absolutely no evidence to support their sweeping generalization that this case involves similar misconduct. The Court is not blind to the realities of the world; police misconduct does occur. Plaintiffs must do more, how-

ever, than simply note this fact. The mere fact that police misconduct occurs—often against African Americans—is far too speculative to allow a reasonable jury to conclude that police misconduct occurred in this specific case.

Plaintiffs must therefore provide evidence to show that misconduct occurred in this case. The only evidentiary support which plaintiffs provide, however, shows that a supervising officer at the Lansing police department told Lansing officer Bledsoe not to put much detail in his report. Bledsoe's deposition testimony, when read in full, does not support any inference that defendants are lying about their beliefs during the incident. Bledsoe testified that a superior officer told him not to put much detail in his report because Leavenworth County officers "were the ones that had control of the incident, it wasn't us." *Plaintiffs' Response To Defendants' Motion For Summary Judgement [sic]* (Doc. # 101), Ex. 8 at 23. Based on the record evidence, a reasonable jury would not conclude that Bledsoe received instructions to provide a false report. Plaintiff also alleges that Duncan disagrees with Bledsoe regarding whether Henry's rear window was blown out during the car chase. As noted above, however, a reasonable jury would read these two pieces of evidence as consistent with each other. Despite plaintiffs' protestations, Bledsoe did not testify that the rear window contained only a "small hole." The only discrepancy is that Duncan stated that the "whole windshield" came out of the car, while Bledsoe testified that glass remained around the edges of the window frame. *See Defendants City Of Lansing, Kansas, Michael Smith, Kenneth Bernard And Steven Wayman's Reply To Plaintiffs' Response To Defendants' Motion For Summary Judgment* (Doc. # 109), Ex. B at 34; *Plaintiffs' Response To Defendants' Motion For Summary Judgment* (Doc. # 101), Ex. at 35–36. Even if the alleged discrepancy would allow a reasonable jury to find that Duncan's report was incorrect, it does not suggest that Duncan intentionally provided false information or that

Duncan was part of a larger scheme to destroy evidence or provide false evidence. Most importantly, plaintiffs' evidence does not show any connection to the Leavenworth County officers who were involved in the decision to approach and arrest Henry. The record therefore does not support any inference that these officers are lying regarding what they believed on the night in question. A reasonable jury would therefore conclude that defendants had reason to believe that Henry had committed serious felonies involving deadly weapons.

**2. Resisting Arrest**

 Plaintiffs argue that Henry was under arrest when he voluntarily pulled from the road, and that defendants used excessive force in removing him from the vehicle. Henry, was not under arrest, however, simply because he voluntarily stopped the car. A "seizure" occurs only when a fleeing person is physically touched by police or when he submits to a show of authority by police. *California v. Hodari D.,* 499 U.S. 621, 626–27, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). While Henry pulled over, he did not submit to a show of authority by police; to the contrary, he continued to ignore police commands for approximately two hours and then shot Wehmeyer when he tried to remove him from the car. The Court finds that Henry was not "seized" until Grenier and Eustice shot him. *See Bella v. Chamberlain,* 24 F.3d 1251, 1256 (10th Cir.1994) (shots result in seizure when suspect submits or shots stop suspect).

The record establishes that Henry was resisting arrest from the time he gave chase to the Lansing police until he suffered mortal injuries at the hands of Grenier and Eustice. During this time, Henry tried to avoid apprehension, shot at Duncan, ignored officers' commands to exit his car (for nearly two hours), and then shot Wehmeyer when he attempted to remove him from the car. Defendants clearly had

reason to believe that Henry was resisting arrest.

### 3. Immediate Danger

Last, the record establishes that Henry posed an immediate threat to the safety of the officers present at the scene, and that defendants did not unreasonably create the need for deadly force. From the beginning, defendants had reason to believe that Henry had fired shots at the Western Sizzlin restaurant; they also had reason to believe that Henry opened fire on Duncan as he pursued Henry's car, and that Henry fired another shot outside the passenger side of his car. Defendants had probable cause to arrest Henry for multiple felonies. After attempting to get Henry to surrender for nearly two hours, Sheriff Nye decided that negotiation was unlikely to end the standoff and that proactive methods were necessary to apprehend Henry. Based upon their knowledge that Henry was armed and had already shot at an officer, Sheriff Nye could reasonably believe that it was necessary to distract and quickly arrest Henry before he could harm anyone. The reasonableness of Sheriff Nye's plan is confirmed by the fact that Henry in fact shot Wehmeyer during the arrest attempt. The Court finds that the sheriff's decision to forcibly arrest Henry was reasonable as a matter of law. *See Myers v. Oklahoma County Bd. of County Comm'rs*, 151 F.3d 1313, 1320 (10th Cir. 1998) (reasonable decision to forcibly enter apartment after two hours of unsuccessful non-confrontational methods).

In addition, the use of deadly force by Grenier and Eustice was not excessive. The Supreme Court has stated the appropriate standard for determining when deadly force is constitutionally permissible:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Here, defendants reasonably believed that Henry had shot at two officers and wounded one. The record reveals that Henry's death was the culmination of a quickly evolving course of events which required truly split-second decisions. TAG members approached Henry's car and detonated the flash bang device. When Wehmeyer opened Henry's driver-side car door, Henry shot him. Wehmeyer fell back and shouted that Henry had shot him. Grenier therefore believed that Wehmeyer and all police officers were in immediate danger. Likewise, Eustice heard Wehmeyer, saw a rifle stock inside Henry's car, and saw Henry moving forward. On these facts a reasonable jury would necessarily conclude that it was reasonable for Grenier and Eustice to believe that Wehmeyer and other officers were in further danger of harm.[28]

Plaintiffs argue that defendants used excessive force in shooting Henry because he was already dead or disabled before the TAG approach. The Court has already discussed the problems with plaintiff's theory that Lansing police officer Wayman

---

**28.** While plaintiffs also list Wehmeyer, Yates and Cummings as defendants involved in Henry's shooting, the record before the Court does not suggest that any of these defendants were involved in either the shooting of Henry or the decision to forcibly arrest him. To the extent that these defendants were involved in either Sheriff Nye's decision or Grenier's shooting, the Court finds that these actions were reasonable as a matter of law. In addition, plaintiffs provide no evidence that would allow a reasonable jury to find that Wehmeyer, Yates and Cummings acted unreasonably during their participation in the forcible arrest attempt.

shot Henry two hours before the TAG approach. In *Plaintiffs' Supplement To Their Response To Defendants Motion For Summary Judgment* (Doc. # 110), plaintiffs argue that Henry shot *himself* before TAG members approached, and that he was either dead or disabled and posed less risk of harm. Plaintiffs attach a document from the KBI in which the author states that "my agent, for whatever it's worth, believes Mr. Henry was dead, or dying, from the self-inflicted .22 caliber head wound, when shot by the police sniper." *See* Doc. # 110 at Ex. 2. Plaintiffs, however, have not shown that this document is admissible evidence. Plaintiffs attempt to fit the document within the public records exception, but they do not provide any affidavit from someone at the KBI with knowledge about the document. In addition, the document itself is not a record, it is a cover letter that was apparently attached to documents which plaintiff subpoenaed. Finally, even if the document is admissible, the author's statement regarding another person's belief is hearsay, and plaintiffs provide no exception which makes this statement admissible.

Even if the Court considers plaintiffs' evidence that Henry was dead or dying before defendants shot him, such evidence does not establish that defendants used excessive force in arresting him. Plaintiffs provide absolutely no evidence that defendants knew or should have known that Henry was injured so severely that he posed no risk before the TAG approach. In fact, plaintiffs freely admit that defendants heard no gun shots from the time Henry pulled over until the time he shot Wehmeyer. In addition, the evidence that defendants *reasonably believed* that Henry had shot Wehmeyer is uncontroverted. Based on plaintiff's evidence, a reasonable jury could not conclude that defendants knew that Henry was dead or severely disabled before the TAG approach.

In the pretrial order, plaintiffs claim that officers shot Henry *after* they arrested him. *See Pretrial Order* (Doc. # 79) at 4. Plaintiffs do not argue this theory in their motion for summary judgment. It appears that the only evidence which supports this theory is the fact that the autopsy failed to mention smoke inhalation and the further fact that Bledsoe's report states that officers "took [Henry] into custody. Nothing further." [29] Even if plaintiffs intended to pursue such a theory, the Court finds that no reasonable jury would find that officers shot Henry after he was handcuffed and taken from the scene. Plaintiffs' evidence is again too speculative. The Court has already determined that plaintiffs' smoke inhalation evidence is not helpful. Likewise, Bledsoe's vague statement is not enough to establish that defendants shot Henry after they arrested him. At his deposition, Bledsoe testified that gunshots occurred before defendants arrested Henry and that he did not see Henry's condition when defendants removed him from the car, other than noticing that Henry was not moving. *See Motion For Summary Judgment* (Doc. # 80), Ex. U at 21, 28, 59. Bledsoe clarified what he meant by his statement that Henry was taken into custody by stating:

> . . . [I]t's just a form of speech in Law Enforcement when we take someone into custody, whether it be through physical force or, you know, if you don't have to use force, you get them handcuffed, to where they are controlled.

*Id.* at 27. Bledsoe's vague statement, when read in context with his other testimony, does not support an inference that defendants shot plaintiff after arresting him and taking him from the scene. Plaintiffs' theory is further undercut by the fact that the coroner pronounced Henry dead at the scene.

This case contains many factual disputes and unanswered questions which

---

**29.** Plaintiffs do not provide Bledsoe's report, but the City of Leavenworth defendants in- clude the report as evidence.

open the door for conspiracy theories. While plaintiffs believe that the mere existence of factual disputes is sufficient to get them past summary judgment, they fail to acknowledge their burden of proof. Plaintiffs' evidence does nothing more than create confusion and unsupportable speculation. As the Tenth Circuit has stated,

> In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. The mere possibility that a factual dispute may exist, without more, is not sufficient to overcome convincing presentation by the moving party. The litigant must bring to the district court's attention some affirmative indication that his version of events is not fanciful.

*Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir.1988). Plaintiffs allege that defendants used excessive force when they shot Henry. Plaintiffs bear the burden of proving this claim, but lack solid evidence to support their allegations. To meet their burden of proof on this theory, plaintiffs must establish that Henry did not present an imminent risk of danger to defendants; plaintiffs cannot simply disagree with defendants' evidence. Plaintiffs' evidence is far too speculative to allow a reasonable jury to conclude that defendants did not have reason to believe that Henry posed a serious danger to officers when they shot Henry.

The Court is not insensitive to the human toll which this incident has exacted; it sympathizes with Lela Henry and Curtis Henry, Sr., who lost son under circumstances that leave many unanswered questions. These questions would encourage any parent to be suspicious. Our system of justice, however, does not deal in either sympathy or suspicion; it is built upon proof. In this case, plaintiffs have not come forward with evidence necessary to prove their claims. Sheriff Nye and county officers Yates, Wehmeyer, Eustice and Grenier are therefore entitled to summary judgment on plaintiffs' Section 1983 claim that the officers used excessive force in seizing Curtis Henry, Jr.[30]

## B. Section 1985(3)

 Plaintiffs' Section 1985(3) claim alleges that Sheriff Nye, police chiefs Smith and Doehring, and officers Yates, Wehmeyer, Eustice, Grenier, Duncanson and Wayman conspired to make false police reports, manufactured evidence to sustain false statements, ordered junior officers not to write complete and detailed reports, and falsely claimed that Henry shot Wehmeyer. Defendants argue that plaintiffs fail to meet the required elements for a conspiracy to violate Henry's civil rights.

 Under Section 1985(3), plaintiffs must show (1) the existence of a conspiracy; (2) intended to deny them equal protection under the laws or equal privileges and immunities of the laws; (3) resulting in an injury or deprivation of federally-protected rights; and (4) an overt act in furtherance of the object of the conspiracy. *Murray v. City of Sapulpa,* 45 F.3d 1417, 1423 (10th Cir.1995).

 The Court agrees that plaintiffs fail to show any evidence of a conspiracy. To prove the existence of a conspiracy under Section 1985(3), plaintiffs must allege facts which show a mutual understanding or meeting of the minds among the conspirators. *Abercrombie v. City of Catoosa,* 896 F.2d 1228, 1230–31 (10th Cir. 1990) (civil conspiracy requires combination of two or more persons acting in concert), *Green v. State Bar of Texas,* 27

---

**30.** In making this finding, the Court has determined that a reasonable jury could only conclude that defendants had probable cause to arrest Henry. Because of this, the Court doubts that a reasonable jury could conclude that defendants violated the Fourth and Fifth Amendment when they seized Henry's gun and knife after seizing Henry. Because the parties fail to address the issue, however, the Court will grant plaintiffs an opportunity to show why the Court should not grant summary judgment on these claims.

F.3d 1083, 1089 (5th Cir.1994); *Taliaferro v. Voth,* 774 F.Supp. 1326, 1332 (D.Kan. 1991). Plaintiffs cannot simply make conclusory allegations that a conspiracy existed; plaintiffs must provide specific facts showing agreement and concerted action. *Lemons v. Lewis,* 969 F.Supp. 657, 664 (D.Kan.1997); *see also Durre v. Dempsey,* 869 F.2d 543, 545 (10th Cir.1989). Plaintiffs provide no evidence of any meetings or agreements among defendants. Plaintiffs allege that supervising police officers told other officers to include as little detail as possible in their police reports. The only evidentiary support which plaintiffs provide, however, shows that a supervising officer at the Lansing police department told Lansing officer Bledsoe not to put much detail in his report. The record also reveals that Duncan's testimony disagrees with Bledsoe's testimony regarding whether Henry's rear window was blown out during the car chase. As discussed above, however, no reasonable jury could conclude that Bledsoe was told to provide a false report or that Duncan's version of events is different than Bledsoe's version. More importantly, the record evidence does not show that Sheriff Nye, police chief Doehring, or officers Yates, Wehmeyer, Eustice, Grenier or Duncanson—who all worked outside the Lansing police department—were involved in any conspiracy to limit their reports. In addition, even though Chief Smith and officer Wayman worked for the Lansing police department, the evidence does not implicate them in any agreement to give shortened reports. Most importantly, any agreement to limit the reports does not establish that defendants destroyed evidence or made false statements. Likewise, even if the disagreement between Duncan's testimony and Bledsoe's testimony would allow a reasonable jury to find that Duncan's testimony was incorrect, it does not suggest that Duncan intentionally provided false information or that Duncan was part of a larger scheme to destroy evidence or provide false evidence which included other Lansing police officers such as Chief Smith and Wayman. Plaintiffs fail to provide any evidence that would allow a reasonable jury to find that these defendants entered a conspiracy to destroy evidence or make false statements.

■ Second, the Court finds that plaintiffs are unable to show that any conspiracy violated Section 1985(3). Section 1985(3) does not "apply to all tortious, conspiratorial interferences with the rights of others," but rather, only to conspiracies motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." *Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir.1993) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 101–02, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). The Supreme Court has narrowly construed what constitutes class-based discrimination. *Id.* (citing *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL—CIO v. Scott,* 463 U.S. 825, 837, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)). Other than noting that plaintiffs are black—an allegation which plaintiffs do not include in their statement of facts or support in the record—plaintiffs provide absolutely no evidence that suggests a race-based animus by defendants. Even assuming that defendants covered up Henry's death, plaintiffs provide no evidence that they did so because of plaintiffs' race. Plaintiffs allege that they fall within a class that Section 1985(3) protects, but do not allege (much less provide evidence) that defendants intended to discriminate against them because of their race. A lone allegation that plaintiffs are in a race-based class is simply not enough to allow a reasonable jury to find that defendants had a discriminatory animus for their alleged actions. *See Dixon v. City of Lawton,* 898 F.2d 1443, 1448 (10th Cir.1990) (plaintiff's scintilla of evidence supporting Section 1985(3) claim insufficient to withstand directed verdict); *see also Crawford v. City of Kansas City,* 952 F.Supp. 1467, 1476 (D.Kan.1997) (racial remark in combination with action not enough to show race-based animus).

Finally, plaintiffs do not allege what constitutional right defendants violated by conspiring to cover up the shooting. The only constitutional violations which plaintiffs allege are set forth in plaintiffs' Section 1983 claim and arise from the actual shooting of Henry. *See Pretrial Order* (Doc. # 79) at 7–8. Plaintiffs' Section 1985(3) claim, however, does not allege a conspiracy regarding the shooting of Henry; it only alleges that defendants agreed to cover up the true facts behind the shooting. Plaintiffs' Section 1985(3) claim is therefore insufficient because it does not allege that any cover up violated any federally-protected right of plaintiffs. *Murray*, 45 F.3d at 1423. In sum, Sheriff Nye, police chiefs Smith and Doehring, and officers Yates, Wehmeyer, Eustice, Grenier, Duncanson, and Wayman are entitled to summary judgment on plaintiffs' Section 1985(3) claim because plaintiffs are unable to show a race-based conspiracy to violate plaintiffs' rights.

## C. Section 1986

■ Plaintiffs' Section 1986 claim alleges that the Leavenworth County Board of Commissioners, the City of Leavenworth, the City of Lansing, commissioner Navinsky, and Mayors Bernard and Weeks knew or should have known about attempts by other defendants to cover up evidence, but failed to stop or prevent it. To bring a Section 1986 claim, plaintiffs must first show a conspiracy in violation of Section 1985(3). *Abercrombie v. City of Catoosa*, 896 F.2d 1228, 1230 (10th Cir. 1990). As discussed above, plaintiffs fail to raise a genuine issue of material fact regarding the existence of a Section 1985(3) conspiracy. Without sufficient evidence of a Section 1985 conspiracy, plaintiff is also

unable to show genuine issues of fact that allow a Section 1986 claim.[31] Said defendants are therefore entitled to summary judgment on plaintiffs' Section 1986 claim.

## D. State Claims

■ Defendants argue that the Court should decline to exercise supplemental jurisdiction over plaintiffs' state law claims. Pursuant to 28 U.S.C. § 1367(c)(3), a district court has discretion to decline to exercise supplemental jurisdiction once it has dismissed the claims over which it had original jurisdiction. *Lancaster*, 149 F.3d at 1236. If all federal claims are dismissed before trial, state law claims will generally be dismissed as well. *Thatcher Enterprises v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir.1990). At this time, however, plaintiffs still have federal claims against Sheriff Nye and officers Yates, Wehmeyer, Eustice and Grenier for violating Henry's Fourth and Fifth Amendment rights by seizing his gun and knife. The Court doubts that plaintiffs will ultimately be able to avoid judgment as a matter of law on these remaining federal claims under Section 1983. It therefore orders plaintiffs to show cause in writing on or before **August 11, 1999** why the Court should not enter judgment as a matter of law, in favor of defendants, on plaintiffs' remaining Section 1983 claims that Sheriff Nye and officers Yates, Wehmeyer, Eustice and Grenier violated the Fourth and Fifth Amendments by seizing Henry's gun and knife. At least at this time, the Court cannot dismiss plaintiff's state law claims by simply declining to exercise jurisdiction over them. It does not foreclose this possibility, but refrains

---

**31.** Defendants also argue that plaintiffs did not bring their Section 1986 claim within the one-year statute of limitations for claims under Section 1986, because Henry was shot on October 19, 1996 and plaintiffs brought this action on October 19, 1998. *See* 42 U.S.C. § 1986. Federal law governs the question of accrual in civil rights actions, and thus dictates when the statute of limitations begins to run. *Smith v. City of Enid,* 149 F.3d 1151,

1154 (10th Cir.1998); *see Fratus v. DeLand,* 49 F.3d 673, 675 (10th Cir.1995). " 'A civil rights action accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action.' " *Smith,* 149 F.3d at 1154 (quoting *Baker,* 991 F.2d at 632). The record does not suggest, however, when plaintiffs knew or should have known about the conspiracy to cover up the evidence behind Henry's shooting.

from addressing defendant's arguments at this time.

**IT IS THEREFORE ORDERED** that plaintiffs' *Motion For Hearing On Defendants' Motion For Summary Judgment* (Doc. # 106) filed June 29, 1999 be and hereby is **SUSTAINED**.

**IT IS FURTHER ORDERED** that *Defendants City Of Lansing, Kansas, Michael Smith, Kenneth Bernard, And Steven Wayman's Motion For Summary Judgment* (Doc. # 86) filed May 28, 1992 be and hereby is **SUSTAINED**.

**IT IS FURTHER ORDERED** that the *Motion For Summary Judgment* (Doc. # 80) filed May 27, 1999 by defendants City of Leavenworth, H.B. Weeks and Lee Doehring be and hereby is **SUSTAINED**.

**IT IS FURTHER ORDERED** that the *Motion Of Leavenworth County Board of Commissioners, Donald Navinsky, Herbert F. Nye, Charlie Yates, Edward Cummings, Michael Wehmeyer, William Eustice, Alfred Grenier And John Duncanson's Motion For Summary Judgment* (Doc. # 83) filed May 28, 1999 be and hereby is **SUSTAINED**.

**IT IS FURTHER ORDERED** that plaintiffs show cause in writing on or before **August 11, 1999** why the Court should not enter judgment as a matter of law on plaintiffs' remaining Section 1983 claims that Nye, Yates, Wehmeyer, Eustice and Grenier violated the Fourth and Fifth Amendments by seizing Henry's gun and knife.